AMERICAN FUTURE SYSTEMS,
INC., Plaintiff,

v.

The PENNSYLVANIA STATE UNIVERSITY et al., Defendants.

Civ. No. 78–262.

United States District Court,
M. D. Pennsylvania.

Feb. 2, 1979.

Joseph S. Finkelstein, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., for plaintiff.

Grant H. Fleming, Delbert J. McQuaide, McQuaide, Blasko & Brown, State College, Pa., Richard Z. Freemann, Jr., Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., for defendants.

OPINION

MUIR, District Judge.

I. Introduction.

The Plaintiff, American Future Systems, Inc., a corporation whose principal business is the sale of cookware, china, crystal, and silverware to college women, brought this action against the Pennsylvania State University (Penn State), the Board of Trustees of that University, John W. Oswald, the President of Penn State, and M. Lee Upcraft, the Director of Residential Life programs at Penn State, seeking a judgment declaring that Penn State's action in banning American Future Systems representatives from the University Park Campus in the fall of 1977 were unconstitutional and requesting the Court to enjoin Penn State from enforcing its policy against commercial solicitation on the campus to preclude American Future Systems from selling its wares to Penn State students. The case was tried before the undersigned judge sitting with an advisory jury from January 5, 1979 to January 11, 1979. The advisory jury answered a series of special verdict questions indicating its belief that the sole purpose of American Future Systems' visits to the Penn State Campus was to sell its merchandise, that American Future Systems used gifts and other inducements as means of persuading Penn State students to invite their representatives on campus, that American Future Systems had a policy of applying different credit practices to freshmen and minority students than to upper-class Caucasian purchasers, that American Future Systems either concealed or failed to reveal certain information to persons in attendance at American Future Systems shows at which its wares were sold with respect to a Florida holiday drawing, and that American Future Systems was excluded from the Penn State campus because it conducted commercial activities for profit rather than because of Penn State's disapproval of either its credit practices or the "Florida holiday" drawing. The following represent the Court's findings of fact, discussion, and conclusions of law.

II. Findings of Fact.

1. American Future Systems, Inc. is a corporation with a principal place of business at 715 Lancaster Avenue, Bryn Mawr, Pennsylvania, 19010.

2. Edward M. Satell is the President of American Future Systems.

3. Defendant John W. Oswald is the President of Pennsylvania State University (Penn State).

4. M. Lee Upcraft is the Director of Residential Life Services at Penn State.

5. Penn State has adopted a policy with respect to fund raising on campus which is set forth both in the terms, conditions and regulations of the housing and food service contract for undergraduate residence halls and dining halls of the Pennsylvania State University (P5) and in the student handbook at page 82, ¶ 3, subsection (a)(8).

6. The terms, conditions, and regulations of the housing and food service contract state on page 35 as follows: "The conducting of any business enterprise for personal profit is prohibited in or around the university-operated units."

7. The student handbook at page 82, ¶ 3, sub-§ (a)(8) reads as follows: "Fund-raising activities are subject to the following restrictions: (8) Lectures, concerts, demonstrations, displays, or exhibits may not be used in any manner as a means of promoting commercial companies, products, or services."

8. In addition to regulating commercial sales, Penn State has adopted certain policies relating to solicitation, which is defined as donations or sales of products for the benefit of non-university charitable organizations, canvassing, which is defined as any effort to influence student opinions specifically excluding solicitation or fund-raising, visitation of students in their rooms either by university or non-university individuals, and the manner by which students are permitted to have overnight guests in a residence hall.

9. Although Penn State prohibits the use of residence hall areas for the benefit of commercial organizations, an individual student who intends to purchase goods or services is permitted to invite a vendor of those goods or services to the residence hall for the purpose of transacting business with him.

10. Penn State's policy against commercial solicitation does not prohibit vendors from attempting to sell their merchandise to Penn State students by means of telephone communication directed into the residence halls.

11. The telephone numbers of students residing in a particular residence hall are available in the lobby of that building.

12. Members of the general public who have not been invited into a residence hall for a specific purpose may enter the lobby of a dormitory in order to examine the list of phone numbers.

13. A "no trespassing" sign is posted at or near the entrance of each residence hall on the Penn State Campus.

14. The residence halls at Penn State contain a number of rooms ranging between 24 and 300 each and there are a total of 6,900 rooms on the University Park Campus. Residence hall facilities are reserved for the use of residence hall residents and their properly invited visitors or guests.

15. Most residence halls on the Penn State Campus have a study lounge designed to be occupied by three to 12 persons as well as other common areas, including bathrooms, storage rooms, and laundry rooms.

16. Any student living in the residence halls at Penn State signs a housing contract which states that he has read the terms and conditions regulating the use of such residence halls and agrees to abide by those terms.

17. The basis of Penn State's policy against commercial activity within the residence halls is the view of the members of the Residential Life Services department that the proper study atmosphere and privacy of the students would be impossible to maintain if commercial vendors were permitted to attempt to conduct sales activities within the residence halls.

18. Penn State's policy against commercial activities on campus does not prevent commercial businesses from advertising in student newspapers or on student radio stations.

19. There is no restriction placed by Penn State on the content of commercial items mailed to Penn State students by means of the United States mails.

20. American Future Systems is engaged in the business of selling cookware, china, crystal, and silverware to college-age women.

21. The sales activities of American Future Systems, Inc. which are relevant to this case relate to attempted sales of a selected number of patterns of china, crystal, silverware and cookware known collectively as the "American Prestige Series."

22. American Prestige Series goods are generally sold at demonstrations or shows attended by the "hostess," a "sales representative," and a number of invited guests.

23. With respect to its sales to college students, American Future Systems operates by having either its "booking office," located at its headquarters in Bryn Mawr or its sales representative who has responsibility for that geographic area in which the college is situated seek out a particular college student by telephone and asking her if she would like to host an American Prestige show on campus.

24. At the time of the initial telephone contact, a student hostess is informed that if she hosts the show, she will be given a tote bag and that there is the possibility that one of the attendees of the show, including herself, will win a "Florida holiday."

25. The value of the tote bag mentioned in the preceding paragraph is $6.00.

26. During the initial telephone conversation, the American Future Systems representative indicates to the student being solicited that the Florida holiday is a vacation in Florida for four days and three nights and does not include meals and transportation.

27. No other terms and conditions relating to the Florida holiday are mentioned during the initial phone contact.

28. Before the scheduled show, a student agreeing to host such a demonstration receives a packet of information containing a number of invitations for guests and a description of what is involved at the show.

29. A sales demonstration put on by American Future Systems generally proceeds in two parts: A demonstration of the American Prestige Series products including a comparison of those products with other merchandise and an explanation of why American Prestige products are superior, and a sales portion where interested students are given an opportunity to purchase products on an installment plan basis.

30. Each student attending the show receives a jade necklace which has a value of $.12½.

31. At the times relevant to this proceeding, it was American Future Systems' policy to attempt to have 10 to 15 persons in attendance at a sales demonstration. That number does not include men, college freshmen, or non-college students.

32. American Future Systems' policy prohibited the drawing of a winner of the Florida holiday or the awarding of the tote bag to a hostess if 10 eligible persons did not attend the show although the latter aspect of that policy is often violated by individual sales representatives.

33. The price of a "package" of merchandise sold to a student by American Future Systems ranges from $450.00 to $600.00.

34. If 10 eligible persons do not attend a sales demonstration, American Future Systems' representatives are under instructions to inquire of a student hostess whether they can go door to door accompanied by the hostess in a residence hall in order to secure the required number of persons for attendance at a show.

35. Sales representatives of American Future Systems generally do not reveal at sales demonstrations that the "Florida holiday" which will be given away may not be used unless the winner is 21 years of age, that the certificate which will be issued expires at a particular time which is often well before a winner reaches the age of 21, that there is an extra charge for the lodging if the vacation is used between December 18 and April 2 of any year, and that a person using the vacation is required to attend a meeting of an organization known as the "VIP Vacation Club" upon arrival in Florida or her certificate will not be validated.

36. American Future Systems pays $2.00 for each Florida holiday vacation certificate issued as a result of one of its drawings.

37. If the student decides to purchase American Prestige Series merchandise at the end of a sales demonstration, she is required to sign a sales contract at that time.

38. American Future Systems does comply with legal provisions requiring it to permit a student signing a contract for the sale of merchandise in the residence hall to rescind the contract within three days of the date of its signing.

39. An American Future Systems' contract contains a "code" at the bottom which consists of a number of letters. Those letters and the explanation given to them by American Future Systems' representatives are as follows:

| Letters | Explanation |
|---------|-------------|
| DPTI | Deposit Turned In |
| K | Deposit kept by sales representative |
| G | General student |
| M | Minority (Black) student |
| C | Married Couple |
| S | Student of Spanish descent |
| O | Student of Oriental descent |
| X | Student of Mexican descent |
| R | Regular 4-year college |
| J | Junior College |
| N | Nursing School |
| V | Vocational School |

40. Sales representatives of American Future Systems are instructed by the company to check those portions of the code which are applicable to any particular purchaser.

41. At the top of an American Future Systems contract there is a space for indicating whether merchandise will be delivered immediately to the purchaser or whether delivery will be deferred until after graduation or until some other time.

42. If the sale of merchandise is made to a minority student who is a sophomore, junior, or senior, sales representatives are encouraged to attempt to have that student request that delivery of his merchandise be by way of deferred delivery rather than by immediate shipment.

43. It is a policy of American Future Systems to require freshmen purchasers to make at least three consecutive installment payments before merchandise can be delivered.

44. No effort is made to encourage Caucasian sophomore, junior, or senior students to request delivery of their merchandise on a deferred basis.

45. In September of 1977, American Future Systems representatives conducted a number of sales demonstrations in the residence halls at Penn State.

46. Prior to that time, Edward M. Satell, the President of American Future Systems, had been advised by Penn State officials that commercial solicitation was prohibited on the campus.

47. In the fall of 1977, without determining whether that policy had been changed, Mr. Satell ordered his sales representatives to begin booking shows on the Penn State campus.

48. Although a number of such shows were conducted from beginning to end in the fall of 1977, some shows were interrupted by Penn State officials and American Future Systems representatives were requested to leave the residence halls because they were acting in violation of university policy.

49. Mr. Satell wrote two letters to Robert Patterson, a Penn State official, on September 14 and September 19, 1977 indicating that Mr. Satell believed that Penn State's prohibition against commercial solicitation in the residence halls was unconstitutional.

50. In response, Mr. Satell received a letter from counsel for Penn State dated October 6, 1977 stating their view that Penn State's policy was legal and that further attempts at solicitation on the campus would result in legal action.

51. American Future Systems has not attempted to conduct any shows on the Penn State campus since October of 1977.

52. In the fall of 1977 Penn State officials did not know of American Future Systems' credit policy or its policy with respect to the "Florida holiday" drawings.

53. American Future Systems was prohibited from conducting sales demonstrations at Penn State because of Penn State's policy against such commercial activity occurring within the residence halls rather than because of any view held by Penn State officials as to the propriety or impropriety of American Future Systems' credit plans or its policy with respect to the "Florida holiday" drawing.

54. Mr. Satell was aware at least by September 15, 1977 that Penn State officials considered the holding of American Future Systems demonstrations to be in violation of university policy.

55. With that knowledge, Mr. Satell instructed his sales representatives, and particularly Karen Wintrey, to attempt to hold such shows on the Penn State campus. Mr. Satell did instruct his sales representatives to follow the instructions of Penn State officials if they requested the sales representatives to leave the campus.

56. Karen Wintrey was told by Mr. Satell that if she encountered problems at Penn State with respect to the booking of sales demonstrations she should ignore the problems because American Future Systems had a legal right to put on such demonstrations.

57. Some of the persons who attended American Future Systems' sales demonstrations at Penn State believed that valuable consumer information relating to the quality of china, cookware, silverware, and crystal was imparted to them by the American Future Systems representative.

58. The purpose of such "consumer information" at American Future Systems sales demonstrations is to promote American Prestige Series merchandise and to encourage attendants of the shows to purchase such merchandise.

59. Patricia Peterson, a Penn State official, informed the sales representatives of American Future Systems in September of 1977 that American Future Systems would be permitted to conduct the educational portion of its show in Penn State residence halls if no attempt were made at the close of such shows to sell merchandise to students and was told that "there would be no point in that."

60. At least one Penn State student was forced to wait in the hall outside a study lounge on the evening prior to an examination because of the presence of an American Future Systems sales demonstration in that study lounge.

61. Mr. Satell stated that he would be willing to abide by some time, place and regulations if American Future Systems programs were permitted to be held on the Penn State campus but that he would continue to pursue certain policies of the company, including the minority credit policy, which he believed the company had a legal right to utilize.

62. The credit policies of American Future Systems are currently being litigated in a suit filed by the United States Department of Justice filed on May 8, 1978 in the Eastern District of Pennsylvania, Civil No. 78–1517.

63. Between 15 and 20% of the attendants at American Future Systems sales demonstrations purchase merchandise.

64. There is at least one student organization on the campus of Penn State which would request an American Future Systems sales representative to come on campus to conduct a sales demonstration if it were permitted to do so by the University.

65. American Future Systems agrees with a student that if there is a dispute with respect to any of the terms of the contract it will accept the results of arbitration before a Better Business Bureau.

66. American Future Systems permits purchasers of merchandise which has not been used to return that merchandise to American Future Systems and receive full credit for the amount paid to American Future Systems to be applied to the purchase of similar merchandise at a retail store of the student's choice so long as the return is made within two years of the date of purchase.

67. Under the installment sales contract entered into between American Future Systems and the student purchaser, no interest is paid during the remainder of that student year and interest thereafter until the student's graduation is at a rate less than that charged by most department stores or credit card companies.

### III. Discussion.

The Plaintiff's complaint in this case raises essentially two issues which must be decided by the Court. First, the Court must consider whether Penn State acted properly in excluding sales representatives of American Future Systems from the University Park campus in September of 1977.

Second, the Court must determine whether Penn State's continued exclusion of such representatives is consistent with the constitutional protection afforded to the sales activities of American Future Systems. Following consideration of the preliminary issues of standing and state action, the Court will consider those two questions *seriatim.*

The Defendants assert in their answer to the complaint that the Plaintiff lacks standing to bring this action. It is the view of the Court that the standing question in this case has two separate facets: Whether American Future Systems has standing to complain about the actions of Penn State and, if so, whether it has standing to raise the constitutional rights of persons not before the Court. With respect to the former question, it is clear that American Future Systems has suffered an injury in terms of sales lost as a result of Penn State's decision to exclude American Future Systems representatives from the campus. Further, American Future Systems contends that as a disseminator of commercial information it has standing to assert its own First Amendment rights. The recognition of such standing is in keeping with the decision of the United States Supreme Court in *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), where the Court indicated that Virginia's prohibition of price advertising by state pharmacists implicated the First Amendment rights both of potential recipients of that information and the pharmacists who were attempting to communicate their prices. Therefore, the Court concludes that American Future Systems does have standing to raise First Amendment claims.

American Future Systems also asserts, however, that it has standing to raise the First Amendment rights of Penn State students who are desirous of receiving information about the products which American Future Systems sells. In support of that contention, American Future Systems cites the case of *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976), where the Supreme Court held that liquor vendors in Oklahoma had standing to raise the rights of Oklahoma males between the ages of 18 and 21 who, unlike Oklahoma females of a similar age, were prohibited from purchasing 3.2% beer. The resolution of the standing question in favor of the Plaintiff in that case, however, had a practical difference from this case because it permitted him to challenge the Oklahoma statutory scheme on equal protection grounds, a constitutional challenge not open to a liquor vendor suing on his own behalf only. Here, American Future Systems is permitted to raise First Amendment contentions based upon its own injury and it is the Court's view that to permit it to raise the First Amendment rights of college students would add little or nothing to the Court's analysis of whether Penn State's actions violated the First Amendment. Additionally, the original complaint in this action was devoid of allegations which would have permitted the Plaintiff to introduce proof at trial that the First Amendment rights of Penn State students had been violated or continued to be violated. The Court denied a request to amend the complaint which was made on the first day of the trial of this case because of the possible prejudice which would result to the Defendants from permission of the amendment. Therefore, because assertion of the First Amendment rights of Penn State students by American Future Systems would add nothing to the analysis of this case and because facts in support of such a claim have not been pled nor proven, the Court will decline to permit American Future Systems to base its arguments on any asserted right of Penn State students to receive its communications.

American Future Systems asserts that it is entitled to raise the constitutional rights of other persons not before the Court as well under the "overbreadth" doctrine. American Future Systems has asserted that the regulations adopted by Penn State are invalid both facially and as applied to the conduct of American Future Systems and maintained the position throughout trial

that evidence relating to particular facets of American Future Systems' presentation including its "Florida holiday" drawing and its credit policy, were not relevant because American Future Systems was not excluded from the campus because of those policies but rather on the basis of a general regulation prohibiting commercial activity on campus. The Court agrees with the Defendants, however, that the overbreadth doctrine should not be applied in the area of commercial speech and that applicable Supreme Court precedence prohibits the Court from permitting American Future Systems to raise the constitutional rights of other commercial vendors who are not before the Court. In *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 771–72, n. 24, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), the Court noted its view that because advertising, the form of commercial speech involved in that case, is the *"sine qua non"* of commercial profits, there was little likelihood that commercial organizations would experience a chilling effect from advertising regulations which might be broader than constitutionally permissible. This viewpoint was reiterated in *Bates v. State Bar of Arizona*, 433 U.S. 350, 381, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977), and in that case the Court held that in the commercial speech context, the conduct of the particular party before the Court must be examined in order to determine whether it is properly subject to regulation regardless of the breadth of the statute or ordinance under which it falls. *See also Ohralik v. Ohio State Bar Association*, 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978); *Broadrick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). Consequently, the Court will not consider whether Penn State's regulation prohibiting commercial sales activity in its residence halls is too broad but will limit its discussion to two questions: whether Penn State properly could have requested American Future Systems representatives to leave the campus in 1977 based upon the manner in which they conducted their activities at that time and whether the continued exclusion of American Future Systems representatives is con-

stitutional based upon the manner in which they propose to conduct their business at this time.

▮ Before turning to resolution of those two issues, the Court must determine whether the First Amendment is applicable to actions of Penn State University. Such a decision necessarily rests upon a resolution of the question of whether Penn State engages in "state action" which makes it susceptible to the dictates of the Fourteenth Amendment. The Plaintiff read into the record at trial certain stipulated facts relating to the state action issue, and this Court held in *Benner v. Oswald*, 444 F.Supp. 545 (M.D.Pa.1978) that the actions of Penn State were state actions. That decision was recently affirmed by the United States Court of Appeals for the Third Circuit. *See Benner v. Oswald*, 592 F.2d 174 (3d Cir., 1979). Consequently, the Court concludes that the requisite state action is present in this case.

The Court now turns to the question of whether American Future Systems representatives could have been excluded from Penn State's campus in September of 1977 consistent with the dictates of the First Amendment. A decision on that question requires the Court to discuss the law applicable to the issue of the amount of First Amendment protection which must be given to commercial speech and to apply that law to the facts of this case. The leading "commercial speech" case and the one which overruled *Valentine v. Chrestensen*, 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed. 1262 (1942), to the extent that it held that commercial speech did not deserve First Amendment protection, is *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). In that case, the Supreme Court ruled that Virginia could not, consistent with the First Amendment, prohibit pharmacists from advertising the prices of prescription drugs. In so holding, the Court noted that a commercial firm enjoys First Amendment interests in communication of such information and that the dissemination of consumer infor-

mation such as the price at which goods are sold serves a societal value in permitting consumers to make free, rational and informed decisions in the consumer marketplace. Further, the Court indicated that such information is often of more interest to the average citizen than "core" First Amendment communications relating to political issues. In that case, the Court concluded that Virginia was attempting to prevent any danger of misuse of commercial information by suppressing it altogether and stated that such a manner of regulation was not permissible, although commercial speech could be regulated through a valid time, place and manner restriction or by other means relating to its potential for deception, including requiring commercial advertisements to contain warnings, disclaimers, or other information needed to make them accurate. In *Bates v. State Bar of Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977), the Court stated that newspaper advertisements by attorneys indicating the price of standard legal services enjoyed constitutional protection. In that case, a disciplinary rule adopted by the state bar, like the rule in *Virginia Pharmacy,* attempted to cure any possible deception inherent in price advertising by prohibiting the communication altogether. Such a rule, the Court stated, served "to inhibit the free flow of commercial information and to keep the public in ignorance." *Bates v. State Bar of Arizona,* 433 U.S. 350, 365, 97 S.Ct. 2691, 2700, 53 L.Ed.2d 810 (1977). Because the Court believed that any justification based upon the benefits of public ignorance was inconsistent with the rationale of the First Amendment, the blanket prohibition was again struck down. In *In re Primus,* 436 U.S. 412, 98 S.Ct. 1893, 56 L.Ed.2d 417 (1978), the Court upheld the right of an attorney associated with the American Civil Liberties Union to communicate to a potential litigant that a cause of action might exist, finding that such a communication partook of the characteristics of "core" First Amendment communication and was not "in person solicitation for monetary gain." The Court indicated that where core First Amendment communications were at issue, exacting scrutiny would be applied to state regulation and broad prohibitions of such communications were inherently suspect. However, in *Ohralik v. Ohio State Bar Association,* 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978), the Court indicated that the type of in-person solicitation for monetary gain engaged in by attorneys which was absent in the *Primus* case could be regulated by a state bar association in a manner different from that by which other protected communications could be governed. The Court noted a number of factors relating to such in-person solicitations which are relevant to this case. First, it stated that commercial speech is not wholly undifferentiable from other forms of speech and indicated that commercial speech can be regulated in a manner not necessarily permissible in the field of non-commercial speech. Second, the Court stated that in-person solicitation of sales is "a business transaction in which speech is an essential but subordinate component" and indicated that it differed even from the type of advertising present in the *Virginia Pharmacy* and *Bates* cases because it had the potential for exerting pressure on the recipient of the information, it demanded an immediate response from him, and it countervailed to some extent the purpose of advertising which permits free, rational, and informed consumer decision-making. Solicitation, because of the pressure on the person being solicited and the requirement that he react either negatively or positively to the service or goods being offered, does not promote reflective thinking on the content of the communication or encourage comparison of different services and prices so that it enjoys less protection than commercial advertising. Consequently, the state's interest in maintaining the professionalism of attorneys and in prohibiting the type of overreaching which was potentially present in in-person solicitation of clients by attorneys justified the state's prohibition of such contacts.

It is beyond dispute that American Future Systems has a right under the First Amendment to disseminate certain in-

formation with respect to the products which it sells. That information probably includes the type of product, how it compares with other products, and the price for which it sells. It is the view of the Court that in this case, however, American Future Systems asserts that it has a First Amendment right which goes beyond the right to disseminate such information to interested consumers. In effect, American Future Systems argues that it has a constitutional right to conduct sales demonstrations which require the presence of an American Future Systems representative, ten to fifteen interested consumers, and an hour-long exposition on the virtues of American Future Systems products followed by a short period of time during which sales to interested students are consummated. The Court is not convinced that American Future Systems has a constitutionally protected right to sell its merchandise to college students in the manner which it has selected as being the most conducive to such sales. The programs put on by American Future Systems representatives on college campuses most closely resemble the conduct in *Ohralik v. Ohio State Bar Association*, 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978) which the Court characterized as a business transaction in which speech is an essential but subordinate component. The Court is not of the view that Penn State's regulations prohibiting commercial solicitation in the residence halls on the University Park Campus can be fairly characterized as a restriction upon the First Amendment rights of American Future Systems. Essentially, Penn State has attempted to separate business transactions from the speech which accompanies them and has sought to regulate only the former. The evidence presented at trial shows that Penn State does not restrict the ability of commercial organizations, including American Future Systems, to advertise in student newspapers or on student radio stations or to provide consumer information to students either through use of the telephone or the United States mails. Penn State has not attempted to prevent whatever evils might be present in the solicitation of sales by Ameri-

can Future Systems representatives by keeping the student body in ignorance of the information American Future Systems attempts to communicate to them. Rather, its policies prohibit American Future Systems representatives only from appearing on campus without an invitation in order to attempt to transact business or from appearing on campus with an invitation in an attempt to transact business with more than one student. It is the view of the Court that Penn State's regulations do not place any burden upon American Future Systems' ability to disseminate information about its products to Penn State students although those regulations do preclude American Future Systems from using its chosen method for such dissemination. So long as the information is reasonably available to students, a commercial vendor has no First Amendment right to disseminate it in the manner in which he chooses.

Assuming, however, that Penn State's residence hall regulations render it more difficult for students to obtain the type of information about commercial products which American Future Systems seeks to distribute, it does not follow that Penn State's regulations must fall. Two justifications support the exclusion of American Future Systems representatives from Penn State in 1977, either of which is sufficient to overcome any possible infringement upon American Future Systems' First Amendment rights. First, Penn State asserts that its residence hall policy is based upon a need for privacy of the students residing therein and the desire on the part of the institution to maintain a study-like atmosphere within the residence halls. Penn State produced evidence at the trial that American Future Systems demonstrations, lasting as long as an hour and a half, can be disruptive of the normal routine of residence halls and can preclude students from using common areas of the dormitories for purposes such as studying, for which they were originally intended. Additionally, the Court recognizes that residence halls are in essence a student's "home away from home" and that the university may adopt such regulations

as are reasonable to prohibit persons who are not university students or residents of dormitories from utilizing space therein. American Future Systems placed much emphasis on the fact that their representatives did not go on the Penn State campus or into the residence halls unless they were invited there by students. However, that contention is weakened when placed in context. The evidence demonstrated that American Future Systems solicits invitations from individual students and that a representative will not go on campus merely to talk with one student even for the purpose of consummating a business transaction. Rather, once an invitation has been solicited, the American Future Systems representative induces the student hostess to invite a number of other students to attend an American Future Systems sales demonstration. Such a sales practice is inconsistent with the premise that American Future Systems speaks only to persons who have taken the initiative to invite them on campus.

 Penn State demonstrated at the trial that in 1977 American Future Systems engaged in certain deceptive or potentially coercive practices. The Supreme Court has recognized that the type of in-person solicitation of sales engaged in by American Future Systems differs from conventional protected speech because of the pressure exerted on the recipient of the sales talk, the fact that he must respond immediately to a request made to purchase merchandise, and the fact that persons in attendance at shows of American Future Systems do not have adequate time to reflect on the information which they have received and to make an intelligent, rational, and informed choice. *Cf. Ohralik v. Ohio State Bar Association,* 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978). Therefore, the fact that American Future Systems engages in in-person solicitation makes that type of conduct peculiarly subject to regulation which attempts to avoid the dangers outlined above. Penn State's prohibition of group solicitation but permission of one student to invite a commercial vendor on campus for the purpose of conducting a business transaction with that student bears a

reasonable relationship to the goal of avoiding the pressure tactics of in-person sales demonstrations. The fact that federal law requires that a student who purchases merchandise in the manner by which American Future Systems sells its products be given a unilateral right of rescission for three days after the sale does not preclude Penn State from attempting to regulate further the conduct of in-person sales solicitations. Further, in 1977 American Future Systems engaged in what this Court views as deceptive practices relating both to its "Florida holiday" drawing and its credit practice. American Future Systems representatives did not disclose the manner in which American Future Systems extended credit to students and concealed at least some of the details relating to the Florida holiday from Penn State students. Therefore, even assuming that Penn State's regulation prohibiting commercial solicitation in the residence halls is overbroad, it was properly applied to American Future Systems in September of 1977. Penn State's interest in the privacy of its students and in preventing a company engaged in questionable commercial practices from soliciting on campus were sufficient to overcome any possible infringement upon American Future Systems' First Amendment rights occasioned by the prohibition of their sales demonstrations. If there is a common theme running through the Supreme Court's recent decisions relating to commercial speech, it is that deceptive and fraudulent commercial speech is clearly subject to reasonable regulation. *See Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976); *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976).

 American Future Systems has also asked the Court to enjoin Penn State from continuing to enforce its policy against commercial solicitation so as to preclude American Future Systems from holding sales demonstrations on the University Park campus. In support of this position, American Future Systems argues that it is

willing to abide by any reasonable time, place and manner regulations imposed by Penn State in the future even though it may not have done so in the past. It is the view of the Court that an injunction should not be issued in this case for a number of reasons. First, as noted above, the Court is not convinced that Penn State's current policy has any effect on American Future Systems' ability to disseminate information which is entitled to First Amendment protection. Therefore, because the current policy with respect to American Future Systems is constitutional, there is no legal basis upon which this Court could enter an order enjoining the enforcement of that policy. Second, the Court is not convinced that American Future Systems is willing to abide by reasonable time, place and manner regulations. Mr. Satell's instructions to his sales representatives in September of 1977 to attempt to book shows although he was aware that Penn State considered the holding of such demonstrations to be a violation of its policy, taken together with his testimony concerning whether he would discontinue certain features of American Future Systems' credit policy with respect to minorities, convinces this Court that American Future Systems will abide only by those regulations which are constitutional in its view. Third, if American Future Systems is interested solely in communicating information about its products and prices to Penn State students, it was offered a means for doing so in September of 1977 when Patricia Peterson, a Penn State official, informed American Future Systems sales representatives that substantially the same sales demonstrations could be conducted on campus if American Future Systems representatives did not attempt to engage in the sale of merchandise at those shows. That offer was rejected by American Future Systems. Such a position makes it abundantly clear that Penn State's regulations, including its willingness to permit American Future Systems representatives to conduct shows on campus so long as no commercial transactions are proposed at that time, do not infringe upon American Future Systems First Amendment rights. Although

American Future Systems may have a first amendment right to communicate to students information relating to the virtues of its products and their price, it has no First Amendment right to sell merchandise at that time on campus. The regulation relating to sales imposed by Penn State is simply an "infringement on profits, rather than on First Amendment rights." *National Market Reports, Inc., v. Brown,* 443 F.Supp. 1301, 1304 (S.D.W.Va.1978) (3-judge court). The Court does not construe Penn State's regulations to prohibit individual students from seeking out American Future Systems representatives at a time following the holding of a show in order to enter into business transactions so long as American Future Systems representatives do not attempt to sell their merchandise at the show to the persons in attendance. Finally, even if the Court were to conclude that Penn State's current policy does infringe upon American Future Systems' First Amendment rights, the interests of privacy and avoidance of the dangers of in-person solicitation served by that policy remain the same today as they did in 1977 and the Court reaches the same conclusion, namely that any such incidental infringement of the First Amendment rights is completely justified by those interests. Therefore, the request for an injunction will be denied.

The Court reaches the following

### IV. Conclusions of Law.

1. American Future Systems, Inc. has standing to challenge Penn State's residence hall regulations only as they apply to the past and present conduct of American Future Systems, Inc.

2. Penn State engages in state action sufficient to subject it to the strictures of the Fourteenth Amendment.

3. American Future Systems, Inc. has the right pursuant to the First and Fourteenth Amendments to the United States Constitution to disseminate certain consumer information to students at Penn State, including descriptions of the products which it sells, comparisons of those products with similar merchandise, and the price at which its products can be purchased.

4. The regulations prohibiting commercial solicitation in the residence halls adopted by Penn State do not infringe on the First Amendment rights of American Future Systems, Inc.

5. Assuming that Penn State's residence hall regulations infringe upon the First Amendment rights of American Future Systems, Inc., the regulations as applied to American Future Systems in 1977 were justified either by Penn State's interest in preventing a commercial vendor from engaging in deceptive or coercive trade practices on the campus of Penn State or, alternatively, by the privacy interests of Penn State's students in their residence halls.

6. The continuing exclusion of American Future Systems representatives from the campus of Penn State does not infringe upon the First Amendment rights of American Future Systems.

7. Assuming that the continuing exclusion of American Future Systems representatives from the Penn State campus infringes upon the First Amendment rights of American Future Systems, that infringement is justified by Penn State's interest in preventing the dangers inherent in in-person solicitation or sales, or alternatively, by Penn State's interest in protecting the privacy of its students within the residence halls.

8. American Future Systems is not entitled to a declaratory judgment that Penn State's expulsion of American Future Systems representatives from the University Park campus in September of 1977 violated the United States Constitution.

9. American Future Systems is not entitled to an injunction prohibiting Penn State from enforcing its policy excluding commercial vendors from residence halls on the University Park campus against representatives of American Future Systems, Inc.