618 F.2d 252
 AMERICAN FUTURE SYSTEMS, INC., Appellant,
v.
The PENNSYLVANIA STATE UNIVERSITY and Board of Trustees of
the Pennsylvania State University and John W. Oswald,
Individually and as President of the Pennsylvania State
University and M. Lee Upcraft, Individually and as Director
of Residential Life Programs of the Pennsylvania State University.
 No. 79-1440.
 United States Court of Appeals, Third Circuit.
 Argued Jan. 11, 1980.
Decided April 3, 1980.
Rehearing and Rehearing En Banc Denied April 29, 1980.
 
 Bernard G. Segal, James D. Crawford (argued), Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for appellant.
 Seth F. Kreimer, Fine, Kaplan & Black, Philadelphia, Pa., for American Civil Liberties Foundation, amicus curiae; Thomas B. Harvey, American Civil Liberties Foundation, Philadelphia, Pa., of counsel.
 David Carliner, Carliner & Gordon, Washington D. C., for U. S. Student Ass'n, amicus curiae.
 Delbert J. McQuaide (argued), R. Mark Faulkner, McQuaide, Blasko & Brown, Inc., State College, Pa., for appellees.
 Before SEITZ, Chief Judge, and VAN DUSEN and WEIS, Circuit Judges.
 OPINION OF THE COURT
 VAN DUSEN, Circuit Judge.
 
 
 1
 Plaintiff, American Future Systems, Inc. (AFS), challenges on this appeal the Pennsylvania State University (Penn State) regulation forbidding sales demonstrations and solicitations in the university owned and operated residence halls. AFS asserts that the First and Fourteenth Amendments prohibit such a policy. After a trial to the court based on a complaint seeking a declaratory judgment that the regulation was unconstitutional and seeking an injunction restraining defendants from enforcing their policy against commercial solicitation on Penn State's campus, the district court held that this regulation does not violate the First Amendment. American Future Systems, Inc. v. Pennsylvania State University, 464 F.Supp. 1252 (M.D.Pa.1979). After careful consideration of the contentions of plaintiff AFS, we affirm for reasons which differ in some respects from those of the district court.
 
 I.
 
 2
 At its University Park campus in State College, Pennsylvania, Penn State owns and operates 68 residence halls, housing approximately 13,000 students. A "No Trespassing" sign is posted at or near the entrance of each dormitory.[1] The floor plans of many of the dormitories are similar. A typical floor has 20 rooms, each occupied by two students. In addition, each floor also has a number of common facilities, such as lavatories, dressing mirrors, a laundry room, a storage room, and a study room. Before students become residents of the dormitories, they must sign a housing contract which states in part:
 
 
 3
 "The conducting of any business enterprise for personal profit is prohibited in or around the university operated units."[2]
 
 
 4
 This statement is amplified by rules set forth in the student handbook:
 
 
 5
 "The institution . . . has rights and responsibilities of its own. The rights and responsibilities of the institution include: . . . (the) (r)ight to prohibit individuals and groups who are not members of the University community from using its physical and operating facilities for commercial . . . activities." App. at V-26a.
 
 
 6
 "Lectures, concerts, demonstrations, displays, or exhibits may not be used in any manner as a means of promoting commercial companies, products, or services." App. at V-27a.
 
 
 7
 "The word 'commercial' . . . means any activity or event which results in personal financial gain to the peddler or organization thereof, provided that contact between a peddler and a student shall not be deemed commercial if such contact was invited by the individual student involved." App. at V-28a.
 
 
 8
 "Persons who are not students or employees of the University, while on University property, are required to . . . abide by University policies and regulations." App. at V-28a.
 
 
 9
 Pursuant to these guidelines, Penn State prohibits all commercial transactions in the dormitories with one exception: an individual student may invite a salesperson to his or her room in the residence hall for the purpose of transacting business with that student only.[3] Penn State's regulation of commercial activities on campus does not prevent businesses from placing advertisements in the student newspapers or on the student radio station. Nor does it preclude sales attempts made via the telephone or the mail.[4]
 
 
 10
 AFS, a corporation headquartered in Bryn Mawr, Pennsylvania, sells china, crystal, silverware, and cookware. AFS seeks to sell its wares at demonstrations attended by a hostess, invited guests, and a sales representative. To procure hostesses for these shows, AFS telephones college students at random, asking if they will host a show in their residence hall and promising each of them a gift of merchandise if they do act as hostess. The hostess then invites other students to the show. Each student is told that those who attend the show will be eligible to participate in the drawing of a winner of a four-day vacation in Florida.[5] AFS attempts to have 10 to 15 students attend each demonstration. If less than 10 eligible[6] students are present, AFS sales representatives are under instructions to ask the hostess to accompany them door-to-door in the residence hall, seeking more guests for the show.[7] Once commenced, the AFS shows last approximately one hour. Most of the show consists of a demonstration of the products. At the conclusion of this portion of the show, the holiday drawing takes place. The students who are not interested in purchasing the AFS products are asked to leave. The students who remain are then asked to sign consumer finance contracts right away.[8]
 
 
 11
 AFS scheduled 51 sales demonstrations in Penn State residence halls for the last two weeks of September 1977.[9] Some of these were interrupted by university officials who informed AFS representatives that they were violating the established policy banning commercial activity. When AFS protested that it had a constitutional right to solicit sales within the residence halls, a Penn State official told AFS that it would be permitted to conduct the demonstration portion of its show if no attempts were made to sell merchandise to the students during the presentation.[10] AFS rejected that arrangement, stating that the sales portion was absolutely crucial.[11]
 
 
 12
 AFS ceased its activity at Penn State and filed suit in federal court, seeking declaratory and injunctive relief as described above. The case was tried to the court before an advisory jury. On February 2, 1979, judgment was entered in favor of Penn State. This appeal followed.
 
 II.
 
 13
 AFS contends that it has a First Amendment right to carry on its demonstrations and sales in the residence halls at Penn State. It rests its assertion on Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), which struck down a state-wide ban on advertising the prices of prescription drugs. Penn State rejoins that Virginia Pharmacy Board does not guarantee to private business enterprises the right to use facilities of state educational institutions for their private business transactions.
 
 The First Amendment provides:
 
 14
 "Congress shall make no law . . . abridging the freedom of speech . . . ."
 
 
 15
 The Fourteenth Amendment secures this freedom against abridgment by a state. Schneider v. State, 308 U.S. 147, 160, 60 S.Ct. 146, 84 L.Ed. 155 (1939). Penn State, created by statute, funded to a significant extent by the state, and built in large part by the Pennsylvania General State Authority, provides the element of state action necessary to trigger an inquiry into the First Amendment values which may be implicated by the Penn State policies regarding commercial transactions. See Benner v. Oswald, 592 F.2d 174, 180 (3d Cir. 1979).
 
 
 16
 Plaintiff AFS is correct that in Virginia Pharmacy Board the Supreme Court ruled that commercial speech is entitled to some level of protection by the First Amendment. 425 U.S. at 770, 96 S.Ct. at 1829. This holding, by itself, does not resolve the issue presented by this case, however. The statutory scheme discussed in Virginia Pharmacy Board effectively suppressed all dissemination of price information throughout the state. The case at hand presents a dramatically different fact situation, implicating many different concerns.
 
 
 17
 Penn State argues that it can restrict the use of its residence halls to purposes which further the educational function of the institution. It urges that transacting sales with groups of students in the dormitories does not further the educational goals of the university and, therefore, can be lawfully prohibited. It emphasizes that AFS seeks a ruling that its sales and demonstrations be permitted in the residence halls, areas which are not open to the general public. In light of all the facts of this case, we believe Penn State is correct.
 
 
 18
 The Supreme Court has held that there cannot be a blanket exclusion of First Amendment activity from city streets, sidewalks, and parks. Hague v. CIO, 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939). As the Court explained:
 
 
 19
 "Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens.
 
 
 20
 Id. Not all publicly owned areas are appropriate settings for speech, debate, and assembly, however. The Supreme Court has explicitly stated:
 
 
 21
 "The State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated."
 
 
 22
 Adderly v. Florida, 385 U.S. 9, 47, 87 S.Ct. 242, 247, 17 L.Ed.2d 149 (1966). In Adderly the petitioners had assembled on the grounds of the county jail to protest peacefully the racial segregation at the jail. This kind of activity has generally been protected by the First Amendment. See, e. g., Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963); Cox v. Louisiana, 379 U.S. 536, 559, 85 S.Ct. 453, 466, 13 L.Ed.2d 471 (1965); Brown v. Louisiana, 383 U.S. 131, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966). Nonetheless, the Court rejected the petitioners' argument that they had a constitutional right to stay on the property because they believed the area was particularly appropriate for the demonstration. 385 U.S. at 47, 87 S.Ct. at 247. Despite the fact that this assembly was nondisruptive and the fact that the grounds were not marked with "No Trespassing" signs, the Court ruled that the First Amendment did not preclude the state from controlling the use of its property for its own purposes and prohibiting the petitioners from speaking and assembling there. Id. at 47-48, 87 S.Ct. at 247.
 
 
 23
 More recently, the Supreme Court has emphasized that even when members of the public are freely permitted to visit a place owned or operated by the government, it does not necessarily become a "public forum" for purposes of the First Amendment. Greer v. Spock, 424 U.S. 828, 836, 96 S.Ct. 1211, 1216, 47 L.Ed.2d 505 (1976). Rather, when the state restricts speech in some way, the court must look to the special interests of the government in regulating speech in the particular location. Id. at 837, 96 S.Ct. at 1217. The focus of the court's inquiry must be whether there is a basic incompatibility between the communication and the primary activity of an area. Grayned v. City of Rockford, 408 U.S. 104, 116, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972).
 
 
 24
 Pennsylvania State University was established for educational purposes by statute in 1855. 24 P.S. § 2531 et seq. Originally known as the Farmers' High School of Pennsylvania, it was specifically created to fulfill traditional educational goals by providing instruction in the humanities, social sciences, and natural sciences. 24 P.S. § 2542. In 1862 it became a land grant college, teaching agricultural and mechanical arts, as well as other subjects. Benner v. Oswald, 592 F.2d at 177. From its beginnings to this day, it has maintained its identity as an institution dedicated to education. Id.
 
 
 25
 As discussed above, members of the general public do not have unrestricted access to Penn State residence halls. "No Trespassing" signs are posted near the entrances to all the residence halls. Although non-residents of the halls may enter the lobbies, they may not proceed freely to the private living areas.[12] We believe that these facts demonstrate that the arena at issue here, the residence halls at Penn State, does not constitute a "public forum" under the First Amendment.
 
 
 26
 We recognize that the absence of a "public forum" from this case does not end our inquiry, however. There are some "non-public forum" areas where the communication does not significantly impinge upon the primary business carried on there. Greer, 424 U.S. at 843, 96 S.Ct. at 1219. (Powell, J., concurring).[13] Penn State asserts that the AFS group sales do impinge significantly on the primary activities of a college dormitory. Penn State argues that its residence halls are "exclusively dedicated to providing a living environment which is conducive to activities associated with being a student and succeeding academically."[14] It contends that group sales activities within the residence halls would disrupt the proper study atmosphere and the privacy of the students.[15] It reiterates that there is no history of allowing group commercial transactions to take place in the dormitories. We conclude that Penn State has articulated legitimate interests which support its ban on group sales activity in the dormitories. We also conclude that these interests are furthered by the proscription against commercial transactions.[16]
 
 III.
 
 27
 AFS attacks the prohibition against commercial activity on another ground. It notes that non-commercial group activities, such as political meetings, are permitted in the residence halls. It argues that, by extending First Amendment protection to commercial speech, Virginia Pharmacy Board forbids this distinction. In a case decided two years after Virginia Pharmacy Board, the Supreme Court explicitly rejected plaintiff's view that commercial and non-commercial speech must be treated exactly alike.
 
 
 28
 "We have not discarded the 'common-sense' distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech. . . . To require a parity of constitutional protection for commercial and noncommercial speech alike could invite dilution, simply by a leveling process, of the force of the Amendment's guarantee with respect to the latter kind of speech. Rather than subject the First Amendment to such a devitalization, we instead have afforded commercial speech a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values, while allowing modes of regulation that might be impermissible in the realm of noncommercial expression."
 
 
 29
 Ohralick v. Ohio State Bar Association, 436 U.S. 447, 455-56, 98 S.Ct. 1912, 1918, 56 L.Ed.2d 444 (1978). In fact, the Supreme Court has upheld regulations which specifically distinguish between communications based on their commercial or non-commercial nature. Lehman v. City of Shaker Heights, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974). Further, the Supreme Court has stated that in the area of commercial speech distinctions based on content may be permissible. Young v. American Mini Theatres, 427 U.S. 50, 70-71, 96 S.Ct. 2440, 2452, 49 L.Ed.2d 310 (1976). In Mini Theatres, the Court narrowed its earlier statements which had indicated that regulation of communication based in any way on content was totally prohibited. The Court remarked that the threshold question "whether speech is, or is not, protected by the First Amendment often depends on the content of the speech." Id. at 66, 96 S.Ct. at 2450. Moreover, "(e)ven within the area of protected speech, a difference in content may require a different governmental response." Id. The Court added that "(t)he measure of constitutional protection to be afforded commercial speech will surely be governed largely by the content of the communication." Id. at 68-69, 96 S.Ct. at 2452, 2450. In Mini Theatres, the Court concluded:
 
 
 30
 "Even though the First Amendment protects communication in this area from total suppression, we hold that the State may legitimately use the content of these materials as the basis for placing them in a different classification from other motion pictures."
 
 
 31
 Id. at 70-71, 96 S.Ct. at 2452. Thus, theaters showing adult movies, which are protected by the First Amendment, can be treated differently and more restrictively from other movie theaters.
 
 
 32
 Such distinctions based on content are permissible under Mini Theatres because they do not violate the "government's paramount obligation of neutrality in its regulation of protected communication." Id. at 70, 96 S.Ct. at 2452. As the Court explained:
 
 
 33
 "(T)he regulation of the places where sexually explicit films may be exhibited is unaffected by whatever social, political, or philosophical message a film may be intended to communicate; whether a motion picture ridicules or characterizes one point of view or another, the effect of the ordinances is exactly the same.
 
 
 34
 "Moreover, even though we recognize that the First Amendment will not tolerate the total suppression of erotic materials that have some arguably artistic value, it is manifest that society's interest in protecting this type of expression is of a wholly different, and lesser, magnitude than the interest in untrammeled political debate . . . ."
 
 
 35
 Id. Although the subject matter of the speech in Mini Theatres differs from that of the commercial communication in the case at hand, both occupy a subordinate, though protected, position under the First Amendment. Thus, the Mini Theatres reasoning is instructive and applicable to this case.
 
 
 36
 In Lehman the Court directly faced a distinction based on the commercial nature of the communications. The Court sustained a policy which permitted commercial advertising on the public transit system but prohibited all political or public issue advertising. In doing so, the Court emphasized that "the nature of the forum and the conflicting interests involved have remained important in determining the degree of protection afforded by the (First) Amendment to the speech in question." Id. 418 U.S. at 302-03, 94 S.Ct. at 2717. It stated that a policy which treats commercial speech differently from non-commercial speech would be sustained so long as it was not "arbitrary, capricious, or invidious." Id. at 303, 94 S.Ct. at 2717.
 
 
 37
 Here Penn State has not totally suppressed the speech of plaintiff. It has restricted that speech somewhat, however. Although AFS sales representatives are allowed into the residence halls to present demonstrations to groups of students, they cannot consummate sales at these gatherings. Even that restriction is removed if the sales representative is invited to the hall by an individual student who decides to purchase the merchandise marketed by AFS.[17]
 
 
 38
 As noted above, Penn State has advanced reasonable objectives to support its ban on group commercial activity in the residence halls. Further, it has emphasized that traditionally there has been an absence of such activity in the halls. This places commercial speech in a quite different category from activities historically associated with college life, such as political meetings or football rallies. We cannot say that the record in this case reveals any arbitrary, capricious, or invidious distinction between commercial and non-commercial speech. We therefore conclude that AFS is incorrect in its assertion that the Penn State policy violates the First Amendment because it treats non-commercial speech differently from commercial speech.
 
 
 39
 Finally, plaintiff asserts that Linmark Associates, Inc. v. Willingboro, 431 U.S. 85, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977), requires that Penn State's regulation must fall. In Linmark the Court held that an ordinance prohibiting the posting of real estate "For Sale" or "Sold" signs on all but model homes violated the First Amendment. The ordinance had been passed in an effort to stem the flight of white homeowners from a racially integrated community.
 
 
 40
 Linmark is distinguishable from the instant case for a fundamental reason. There the Court stressed that the ordinance was not enacted "in order to promote (any) . . . value 'unrelated to the suppression of free expression.' " Id. Rather, it was enacted because the town feared the primary effect of the communication "that (it would) cause those receiving the information to act upon it." Id. at 94, 97 S.Ct. at 1619. The town wished to suppress the information that homes were for sale. On the other hand, according to Linmark, regulations adopted because the place or manner of speech produces detrimental secondary effects on society may survive constitutional scrutiny. See Mini Theatres, 427 U.S. at 71 n. 34, 96 S.Ct. at 2453 n. 34.
 
 
 41
 It is undisputed that, in support of its regulation, Penn State has advanced an argument based on a secondary effects theory. Penn State has not sought to suppress the communication that AFS, or any other commercial enterprise, has goods for sale. Instead Penn State has sought to exclude group sales from the residence halls in order to preserve better the traditional college environment and atmosphere conducive to effective education and learning.
 
 
 42
 Additionally, it cannot be said here, as it was in Linmark, that Penn State is attempting to achieve its goal by suppressing the free flow of truthful information. As mentioned earlier, not only is AFS free to sell its goods elsewhere than in the residence halls, it can even enter those halls, upon invitation, and set up group demonstrations of its products. All that it is restricted from doing is actually completing in those halls its desired commercial transactions.[18] Thus, we conclude that Linmark does not require us to revise our conclusion that the Penn State regulation regarding commercial speech survives constitutional scrutiny.
 
 
 43
 Accordingly, for the foregoing reasons, we will affirm the judgment of the district court.
 
 
 
 [1]
 464 F.Supp. at 1255, P 13
 
 
 [2]
 Id. at 1254, P 6
 
 
 [3]
 Id. at 1255, P 9
 
 
 [4]
 Id. at PP 10, 18, 19. The telephone numbers of residents are listed in the lobbies of the dormitories, where they are available to members of the public. Id. at PP 11-12
 
 
 [5]
 The "Florida holiday" is described in the initial telephone conversation as a vacation in Florida for four days and three nights, with meals and transportation not included. Id. at 1256, P 26. No other terms are mentioned during that conversation. Id. at P 27. At the sales demonstrations themselves, AFS sales representatives generally do not reveal that the following restrictions on the vacation exist:
 (I)t may not be used unless the winner is 21 years of age, . . . the certificate which will be issued expires at a particular time which is often well before a winner reaches the age of 21, . . . there is an extra charge for the lodging if the vacation is used between December 18 and April 2 of any year, and . . . a person using the vacation is required to attend a meeting of an organization known as the 'VIP Vacation Club' upon arrival in Florida or her certificate will not be validated."
 Id. at P 35.
 
 
 [6]
 Male students, college freshmen, and non-college students are not "eligible." Id. at 1256, P 31
 
 
 [7]
 Id. at P 34
 
 
 [8]
 App. at I 64-65
 The trial court made factual findings that AFS sales representatives indicate by code on the sales contract the race and national origin of the purchaser. Those purchasers who are minority students are encouraged to request delivery of the merchandise on a deferred basis, rather than immediately. Non-minority students are not encouraged to seek deferred delivery. Freshman students of all races are required to make three consecutive installment payments before delivery, however. 464 F.Supp. at 1257, PP 40-44.
 
 
 [9]
 App. at III 59
 
 
 [10]
 464 F.Supp. at 1258, P 59
 
 
 [11]
 Id
 
 
 [12]
 464 F.Supp. at 1255, P 12
 
 
 [13]
 Indeed, in Tinker v. Des Moines School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), the focus was on a school, and the Court struck down a policy which restricted the "political speech" of students. The Court held that the First Amendment prohibited the school officials from punishing students for the symbolic act of wearing black armbands to protest the hostilities in Vietnam. While solicitous of the free speech rights of students, the Tinker Court emphasized "the need for affirming the comprehensive authority of the States and of school officials . . . to prescribe and control conduct in the schools." Id. at 507, 89 S.Ct. at 737. The Court placed great significance on the fact that the banned "speech" was silent and solitary, with no hint of group activity
 "The school officials banned and sought to punish petitioners for a silent, passive expression of opinion, unaccompanied by any disorder or disturbance on the part of petitioners. There is here no evidence whatever of petitioners' interference, actual or nascent, with the schools' work or of collision with the rights of other students to be secure and to be let alone. Accordingly, this case does not concern speech or action that intrudes upon the work of the schools or the rights of other students.
 "Only a few of the 18,000 students in the school system wore the black armbands. Only five students were suspended for wearing them. There is no indication that the work of the schools or any class was disrupted."
 Id. at 508, 89 S.Ct. at 737.
 Under the Tinker decision, students in the Penn State residence halls could not be forbidden to wear armbands in a silent political protest. It does not bolster plaintiff's claim before this court, however. The AFS sales activity is not silent, passive, or solitary. Rather, it is by definition group activity; it takes place in a hall where 40 students live in close quarters; and it has at least the potential to intrude upon the rights of other students. Further, the district court found that at least one student was forced to wait outside a study room on the evening prior to an examination while AFS conducted a sales demonstration in that room. 464 F.Supp. at 1258, P 60.
 
 
 [14]
 Appellees' brief at 17
 
 
 [15]
 464 F.Supp. at 1255, P 17
 
 
 [16]
 AFS argues that the First Amendment protects not only its right to carry on sales activities in the residence halls, but also the students' rights to take part in sales there. In Virginia Pharmacy Board, 425 U.S. at 757, 96 S.Ct. at 1823, the Supreme Court explicitly said that "(i)f there is a right to advertise, there is a reciprocal right to receive the advertising . . . ." Yet this statement does not resolve the dispute before us. The Court did not hold that because an individual may have a right to receive certain advertising information, that individual also has a right to participate in a commercial transaction wherever he or she pleases. The analysis contained in the text concerning the legitimacy of the restriction on AFS group sales in the residence halls applies as well to students who desire to purchase AFS products at group meetings. Also, we reiterate that the Penn State policy does allow an individual student to invite a sales representative into his or her room for the purpose of individually purchasing goods
 
 
 [17]
 Of course, alternate methods of advertising its wares and transacting sales are still available to AFS. See text accompanying n. 4, supra
 
 
 [18]
 Although in Linmark the law restricted only one method of communication, the Court stated that this ordinance could not be sustained as a legitimate regulation of time, place, and manner of speech because ample alternative channels of communication were not available. Id. 431 U.S. at 93, 97 S.Ct. at 1618. The Court emphasized that the alternatives theoretically available were not methods through which realty is generally marketed. Id. This factor differs in the case before this court. There are available a number of alternatives which are generally used to market the kind of merchandise AFS sells. Cookware and china, for example, are often advertised in newspapers, through mailings, and on television, and are generally sold through stores, via catalog sales, or from demonstration booths. Thus, there are many more viable alternatives available for marketing these kinds of products than there are for selling one's dwelling
 AFS argues that it believes that group sales meetings are the most effective method of merchandising its goods. We do not believe that this is dispositive. Linmark does not stand for the proposition that the First Amendment requires that a seller in all instances be able to use the techniques he considers most effective. Rather, Linmark teaches that a realistic appraisal must be made of the alternative methods of communication generally used in marketing different products.