AMERICAN FUTURE SYSTEMS, INC., Kathleen Rapp and Todd Fox, Plaintiffs,

v.

The STATE UNIVERSITY OF NEW YORK COLLEGE AT CORTLAND, The Board of Trustees of the State of New York, Clifton R. Wharton, Jr., Individually and as Chancellor of the Board of Trustees, James M. Clark, Individually and as Chancellor of the Board of Trustees, James M. Clark, Individually and as President of the College at Cortland, Raymond Franco, Individually and as Director of Housing at the College at Cortland, Margaret Attermeier, Individually and as Randall Residence Hall Director at the College of Cortland, and Officer Edward B. Moore, Individually and in his Capacity as Campus Police Officer at the College at Cortland, Defendants.

No. 82–CV–1363.

United States District Court, N.D. New York.

June 3, 1983.

Ronald H. Sinzheimer, Albany, N.Y., for plaintiffs; Duane, Morris & Heckscher,

Henry T. Reath, George E. Pierce, Jr., Philadelphia, Pa., of counsel.

Robert Abrams, Atty. Gen. of the State of N.Y., Albany, N.Y., for defendants; Lawrence L. Doolittle, Asst. Atty. Gen., Albany, N.Y., of counsel.

McCURN, District Judge.

In one of the early Supreme Court cases involving what would now be called "commercial speech", the majority and two dissenting Justices were in confident agreement that a seller of mere "pots" or "gadgets or brushes" could claim no First Amendment protection for the hawking of such wares. *Breard v. City of Alexandria, La.,* 341 U.S. 622, 641, 650 n. *, 71 S.Ct. 920, 932, 936 n. *, 95 L.Ed. 1233 (1951). Since that time, the scope of protection accorded to commercial speech has expanded greatly, though by no means steadily. In this suit the Court must apply current commercial speech doctrine to the merchandizing of cookware.

American Future Systems, Inc. (AFS) is a corporation whose principal business is the sale of cookware, china, crystal, and silverware to college students through group demonstrations of its merchandise. It has brought this action for declaratory and injunctive relief against the State University of New York at Cortland (SUNY Cortland) and various state officers who have refused to permit it to conduct product demonstrations in campus dormitory rooms, even when invited to do so by students. AFS asserts that SUNY is thereby depriving it of its right to free speech. Kathleen Rapp, a representative of AFS and co-plaintiff, joins in that assertion. Todd Fox, a student who was denied permission to "host" one such demonstration, also a co-plaintiff, claims a deprivation of his rights of speech, privacy, and association. Claims under the due process and equal protection clause and the search and seizure clause are also asserted, as are pendent claims under the constitution and laws of New York State.

Presently before the Court is plaintiffs' motion for a preliminary injunction permitting them to conduct their demonstrations at SUNY Cortland without interference *pendente lite.* In support of the motion, plaintiffs have furnished the Court with an extensive set of affidavits and exhibits, documenting the manner in which AFS conducts its business, the opinion of particular students and academicians as to the value of those demonstrations, and the events which preceded the commencement of this suit.

Although the defendants have by no means conceded all of the factual allegations of the plaintiff, they have taken the position that an evidentiary hearing is not necessary for determination of this motion since the allegations fail to entitle plaintiffs to any relief, preliminary or permanent, as a matter of law. They have, however, submitted one affidavit from a SUNY official, explaining the purpose of the challenged policy.

The primary dispute between the parties is one of law. The Court considers itself to be adequately apprised of the factual setting by the affidavits and the exhibits to make a determination of this motion without need for an evidentiary hearing. *See, Herbert Rosenthal Jewelry Corp. v. Grossbradt,* 428 F.2d 551, 554 (2d Cir.1970). For the reasons set forth below, we hold that (1) plaintiffs are likely to prevail on their claim that SUNY may not, consistent with the First Amendment, completely prohibit AFS from disseminating information about its products through group demonstrations in dormitory rooms when invited to do so by a student-resident; but that (2) plaintiffs are *not* likely to prevail on their claim that SUNY may not lawfully prohibit the consummation of sales at the conclusion of any such group demonstration.

I.

AFS presents its product demonstrations to groups of ten or more students in private student dormitory rooms upon invitation by a student residing in that room. The "student host" who invites the AFS representative, brings together with prospective customers, and provides use of his or her dormitory room for the demonstration, is given

certain "incentives" for performing such services.[1] AFS emphasizes that the demonstrations are informative and educational in that they teach students much about the products and also about sales. Purchases are made, usually by credit agreements, at the conclusion of the demonstrations.

The Board of Trustees of SUNY has implemented the following regulation challenged here:

> No authorization will be given to private commercial enterprises to operate on State University campuses or facilities furnished by the University other than to provide for food, campus bookstore, laundry, dry-cleaning, barber and beauty services, and cultural events.

Resolution No. 66–156 as amended by 73–56. SUNY interprets this policy to bar AFS from conducting its demonstrations on all SUNY campuses.

The inevitable confrontation unfolded as follows: A representative conducting a demonstration in a dormitory room on October 17, 1982, was told to leave by the Resident Director and then the campus police; she did so. The following day, the AFS Regional Director, Kathleen Rapp, entered the dormitory to give a demonstration upon invitation by a student. As set forth in Ms. Rapp's affidavit, the dormitory director came into the room at the order-taking stage of the presentation, and told Rapp to leave the premises. Rapp replied that she had a constitutional right to stay. The campus police arrived and again told the representative to leave, and she again refused.[2] The officers then arrested Rapp on charges of loitering and soliciting without a permit. A charge of trespass was later added.

Subsequently, another student—the plaintiff Todd Fox—agreed to host an AFS presentation in his dormitory room. He first requested permission from defendant

Raymond Franco, Director of Resident Life at SUNY Cortland. Franco responded by a letter denying Fox permission to host the demonstration and stating that legal action, other than arrests, would be taken if any such demonstration were held.

This suit was commenced on December 2, 1982. Defendant has filed an Answer asserting, primarily, the defense that "there is no constitutional or other right to conduct commercial activities in public facilities and in University dormitories or residence halls in particular", and that there is a substantial state interest in barring such activities.

## II.

AFS is currently prosecuting a similar suit in federal court against Pennsylvania State University, and has, after extensive litigation, secured a narrow preliminary injunction whereby the named student-plaintiff may host product demonstrations *pendente-lite*. *American Future Systems, Inc. v. Pennsylvania State University* et al. ("*AFS v. Penn State*"), No. 81–0171, 553 F.Supp. 1268 (M.D.Pa.1982). Since the suit in Pennsylvania raises many of the issues present herein, it is instructive to summarize the course of that litigation before turning to the instant motion.

In its initial action in Pennsylvania, AFS asserted the right to conduct group product demonstrations and sales in common areas of the residence hall. After a trial with an advisory jury, Judge Muir issued fact findings that, *inter alia,* vendors had alternative means of both communicating with and selling to students; that AFS had engaged in questionable sales practices; that Penn State was enforcing a general rule against commercial solicitation and was not singling out AFS for enforcement of the rule on account of any particular practice by AFS. *AFS v. Penn State,* 464 F.Supp. 1252, 1254–8 (M.D.Pa.1979).

*American Future Systems, Inc. v. Pennsylvania State University,* 464 F.Supp. 1252, 1256 (M.D.Pa.1979).

---

**1.** The record does not reveal precisely what those "incentives" are; nor is it a material issue for this motion. We observe, however, that in a previous suit brought by AFS, it was found that prospective hosts were promised a gift and a chance to win a Florida vacation.

**2.** One of the police officers, Edward Moore, is a named defendant in the action.

The Court then held that AFS had a right under the First Amendment to disseminate information as to the product that it sells, but that it did not have a right "to sell its merchandise to college students in the manner which it has selected as being most conducive to sales." *Id.* at 1262. After concluding that the ban on group product demonstrations and sales was "justified by Penn State's interest in preventing the dangers inherent in in-person solicitation or sales, or alternatively, by Penn State's interest in protecting the privacy of its students within the residence halls", *Id.* at 1265, the Court ordered judgment for the defendant.

On appeal, the Third Circuit affirmed Judge Muir's decision. *AFS v. Penn State,* 618 F.2d 252 (3d.Cir.1980). However, in so doing, the Court emphasized that Penn State had offered to permit AFS to conduct its demonstrations provided it did not transact business at the conclusion of such demonstrations:

> Here Penn State has not totally supressed the speech of the plaintiff. It has restricted that speech somewhat, however. Although AFS sales representatives are allowed into the residence halls to present demonstrations to groups of students, they cannot consummate sales at these gatherings. Even that restriction is removed if the sales representative is invited to the hall by an individual student who decides to purchase the merchandise marketed by AFS.

*Id.* at 258.

The Court further held that Penn State had a legitimate basis for distinguishing between commercial and non-commercial speech, and that its prohibition of commercial transactions was a valid measure "to preserve better the traditional college environment and atmosphere conducive to effective education and learning". *Id.* at 259.

AFS interpreted the Third Circuit decision as an acknowledgment of its right to present unregulated product demonstrations in the common areas of Penn State's residence halls, and it returned to District Court to obtain a preliminary injunction

barring interference with such demonstrations. At the same time it also sought an injunction permitting it to conduct group demonstrations and sales in students' dormitory rooms. Moreover, six students joined as co-plaintiffs, asserting their own speech, association, and privacy rights to host or attend demonstrations in both the common areas and dormitory rooms. Judge Muir denied the preliminary injunctions on the grounds that (1) AFS's claims were barred by *res judicata;* (2) the students' claims lacked the requisite showing of irreparable harm and probability of success on the merits. *AFS v. Penn State,* 510 F.Supp. 983 (M.D.Pa.1981). The Court noted that the student plaintiffs were free to attend the demonstrations in the residence hall common areas and subsequently purchase the goods individually in their rooms. In addition to finding no infringement of any free speech rights, the Court specifically found no likelihood of the students prevailing on privacy or associational rights grounds, since it was unable to discern how either of those rights were curtailed.

Upon subsequent motion by the defendant, the District Court granted summary judgment against AFS, essentially repeating the same analysis as in its previous denial of a preliminary injunction. *AFS v. Penn State,* 522 F.Supp. 544 (1981). One arguably new issue raised at this stage of the litigation involved plaintiffs' claim that Penn State engaged in "censorship" when it screened AFS' presentation to ensure that they were only informational and did not involve commercial solicitation. The Court found that the material which AFS sought to include in its presentation was impermissible under prior decisions in the case, and therefore rejected the charge of censorship. Again, the Court held that Penn State's regulations were not a significant infringement of the students' speech, privacy, or associational rights.

Plaintiffs again appealed to the Third Circuit, which addressed separately the claim of censorship and the student's claim of a right to host or attend group demonstrations in their dormitory rooms. *AFS v.*

*Penn State,* 688 F.2d 907 (1982). The Court discerned in the censorship claim a new issue, not barred by *res judicata:* whether Penn State could prohibit portions of AFS' demonstration on the basis of content, in addition to barring consummation of the transaction. The Court found that Penn State had been preventing AFS from disclosing price, credit, and guarantee terms, information which the Court regarded as protected commercial speech under *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). Failing to find a substantial governmental interest in this content-based restriction, the Court reversed the summary judgment previously entered against AFS.

Turning to the student's claims, the Court first agreed with the district court that Penn State could limit AFS activities in the *common areas* of the residence halls to the dissemination of information, and could bar the transactions that typically followed product demonstrations. But it found that the district court failed to adequately consider "the students' associational and free speech rights in their activities in their dormitory rooms independently from the activities conducted in the common areas," *Id.* at 915. The Court acknowledged that "Penn State may indeed have a satisfactory reason for distinguishing between group activity in individual dormitory rooms and in common areas", *id.* at 915, but the record below did not reveal it. Consequently, summary judgment as to the students was also reversed, and the case remanded to the district court.

Once again before Judge Muir, plaintiffs re-moved for a preliminary injunction to enable the students to hold demonstrations of AFS merchandise in their dormitory rooms. The Court held first that AFS' rights were derivative, and not sufficient to warrant a preliminary injunction on their behalf; nor could AFS demonstrate irreparable harm if the injunction were denied. *AFS v. Penn State, supra,* 553 F.Supp. 1268 (1982).

However, Judge Muir regarded the students' claim as more substantial, particularly their assertion of speech rights. Irreparable harm was discerned in (1) the intangible nature of the constitutional right in question and its incapability of redress by damages, and (2) the temporary duration of the plaintiff-students' residence in the dormitories.

Turning to the question of "probable success on the merits", the Court found the students' chances of success quite strong. It reasoned that Penn State's restriction on commercial activities are invalid unless they "leave open alternative channels for communication", *id.* at 1280, and found a lack of such alternative channels. It then analyzed the purported "significant governmental interests" suggested by Penn State (i.e., to protect students' privacy, avoid disruption, protect students from misleading or coercive sales practices, etc.) and found those interests "unconvincing", *id.* at 1280, in view of other activities permitted in the dormitories. The Court also observed that more narrowly tailored regulations could serve the university's interest in preventing disruption and other anticipated problems.

The Court therefore concluded that an injunction was warranted, but it tailored that injunction quite narrowly: relief was granted only as to the one named plaintiff who was still a student at the time of the decision.

With the benefit of several thorough and highly pertinent decisions from Judge Muir and the Third Circuit in hand, we turn to the motion now before this Court.

### III.

To obtain a preliminary injunction in this Circuit, the movant must show "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting preliminary relief." *Jackson Dairy, Inc. v. H.P. Hood & Sons,* 596 F.2d 70, 72 (2d Cir.1979). *Phillips v. Marsh,* 687 F.2d 620 (2d Cir.1982). Mov-

ants' burden is generally considered enhanced when the injunction sought would change the status quo. *See, Holy Spirit Assn., Etc. v. Town of New Castle,* 480 F.Supp. 1212, 1214 (S.D.N.Y.1979) ("The purpose of the preliminary injunction is to preserve the status quo between the parties pending a full hearing on the merits"); *Patterson v. United Fed. of Teachers,* 480 F.Supp. 550, 553 (S.D.N.Y.1979).

■ The requirement of "irreparable harm" is satisfied in this case by the very nature of the claim. In *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976), the Supreme Court held that "(t)he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Since plaintiffs have alleged deprivation of their First Amendment rights, irreparable harm must be presumed. *See, Intern. Soc. for Krishna, Etc. v. City of N.Y.,* 484 F.Supp. 966, 970–71 (S.D.N.Y.1979); *NY-PIRG v. Village of Roslyn Estates,* 498 F.Supp. 922, 930 (E.D.N.Y.1979); *St. Martin's Press, Inc. v. Carey,* 440 F.Supp. 1196, 1204 (S.D.N.Y.1977); see also, *Katz v. McAulay,* 438 F.2d 1058, 1060 n. 3 (2d Cir. 1971).

The next prong of the preliminary injunction standard, "likelihood of success on the merits", involves the Court in evaluating the merits of plaintiffs' claims. Clearly the claim of deprivation of first amendment speech rights is the most substantial ground for challenging the university regulation, and that claim is addressed first.

## IV.

■ The dissemination of information through group product-demonstrations is "speech", and the regulation of such demonstrations must comport with the First Amendment.[3] *AFS v. Penn State, supra,* 464 F.Supp. 1252 (M.D.Pa.1979), *aff'd,* 618 F.2d 252 (3d Cir.1980). We thus reject at the outset defendants' contention that "(t)his case does not involve speech". *Affi-*

*davit in Opposition* at 4. A demonstration of AFS products plainly includes communicative activity. Though the *content* or *purpose* of that communicative activity may be commercial in nature, the activity does not thereby lose its character as "speech". *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). Nor does the *method* of communications— involving a physically present speaker—disqualify the activity as speech; indeed, it is a more literal form of speech than the advertising in *Virginia Pharmacy.* Of course, under certain circumstances in-person communication may claim only a lower level of First Amendment protection, but it is "speech" nonetheless. *See, Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 457, 98 S.Ct. 1912, 1919, 56 L.Ed.2d 444 (1978).

■ At the same time, the Court remains completely unconvinced by the record before it that the "speech" in question is "pure" as opposed to "commercial" speech. The distinction is significant in that "(t)he Constitution... accords a lesser protection to commercial speech than to other constitutionally guaranteed expression", *Central Hudson Gas & Electric Corp. v. Public Service Comm'n of New York,* 447 U.S. 557, 563, 100 S.Ct. 2343, 2350, 65 L.Ed.2d 341 (1980), and the permissible scope of governmental regulation is broader with respect to the former.

"Commercial speech" has been variously defined by the Supreme Court as "expression related solely to the economic interests of the speaker and its audience," *Central Hudson, supra,* 447 U.S. at 561, 100 S.Ct. at 2348, or "speech proposing a commercial transaction", *Id.* at 562, 100 S.Ct. at 2349, *citing Ohralik, supra,* 436 U.S. at 455–56, 98 S.Ct. at 1918. *See also, Virginia Pharmacy, supra,* 425 U.S. at 762, 96 S.Ct. at 1825 ("speech which does 'no more than propose a commercial transaction'"). Commentators have recognized the difficulty in arriv-

---

**3.** "Congress shall make no law ... abridging the freedom of speech ..." U.S. Const. Amend. I.

ing at a satisfactory definition, *see,* Notes: Constitutional Protection of Commercial Speech, 82 *Col.L.Rev.* 720, 720 n. 2; *see also, Central Hudson, supra,* 447 U.S. at 598, 100 S.Ct. at 2368 (Rehnquist, dissenting), and the above-mentioned formulations have been criticized as too broad and apt to embrace more valuable forms of speech. *Central Hudson, supra,* 447 U.S. at 579–83, 100 S.Ct. at 2358–60 (Stevens, J. concurring). In practice, however, the Court has had little difficulty in making what it essentially considers to be a "common sense distinction", *Central Hudson, supra,* 447 U.S. at 562, 100 S.Ct. at 2349, quoting, *Ohralik, supra,* 436 U.S. at 455, 98 S.Ct. at 1918, and it has scarcely hesitated to apply the "commercial speech" label in a variety of contexts where the communication tended to promote the sales of goods or services. *See, e.g., Village of Hoffman Estate, Inc. v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982) (displaying and marketing of drug-related paraphernalia); R—— M.J.——, 455 U.S. 191, 102 S.Ct. 929, 71 L.Ed.2d 64 (1982) (attorney area of practice advertising); *Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981) (billboard advertising) *Central Hudson, supra,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (promotional advertising by utility); *Friedman v. Rogers,* 440 U.S. 1, 99 S.Ct. 887, 59 L.Ed.2d 100 (1979) (use of trade name by optometrist); *Ohralik, supra,* 436 U.S. 447, (1978) (in-person solicitation by attorney); *Virginia Pharmacy, supra,* 425 U.S. 748, 96 S.Ct. 1817, 48. L.Ed.2d 346 (1976) (drug price advertising).

In support of its view that the speech in question is "pure speech", plaintiff has submitted affidavits from two academicians with impressive credentials, who attest to the "informative and educational" value of the AFS presentation. In particular, the demonstration is said to not only enlighten the audience as to the virtues of AFS products, but also to teach students about "budgeting and planning for the future", to cause them "to review their non-academic oriented personal priorities", and to afford them "insights into a real life situation in-volving group dynamics". *Affidavit of Dr. Larry J. Krafft* at 3.

The Court acknowledges that there may be something to be learned from AFS demonstrations beyond the core information necessary for a commercial transaction, and that the listener may in some sense benefit from the experience. Indeed, we would also find it difficult to dispute the observation of John Dewey that "all communication ... is education. To be a recipient of a communication is to have an enlarged and changed experience". J. Dewey, *Democracy and Education* 6 (1916), quoted from Notes: Constitutional Protection of Commercial Speech, *supra,* 82 *Col.L.Rev.* at 740 n. 145. However, the ability of the plaintiff to identify some abstract non-commercial value which might be gleaned from the sales presentation does not disable the Court from making the "common sense distinction" required by the Supreme Court.

■ The Court expressly dealt with the problem of subordinate non-commercial attributes of otherwise commercial speech in *Central Hudson.* In addressing the concern expressed by Justice Stevens, that advertising by the utility raised questions beyond those of a purely commercial nature, the Court warned against "blur(ring) further the line that the Court has sought to draw in commercial speech cases". 447 U.S. 562 n. 5, 100 S.Ct. at 2349 n. 5. Continuing, the Court observed that,

(Justice Stevens' approach) would grant broad constitutional protection to any advertising that links a product to a current public debate. But many, if not most products may be tied to public concerns with the environment, energy, economic policy, or individual health and safety. We rule today ... that *utilities enjoy the full panoply of First Amendment protections for their direct comments on public issues. There is no reason for providing similar constitutional protection when such statements are made only in the context of commercial transactions...* As we stated in *Ohralik,* the failure to distinguish between commercial and non-

commercial speech 'could invite dilution, simply by a leveling process, of the force of the (First) Amendment's guarantee with respect to the latter kind of speech'. *Id.* at 562 n. 5, 100 S.Ct. at 2349 n. 5 (citations omitted; emphasis added). Thus the Court has instructed that the distinction between "commercial speech" and "pure speech" be made, and that the possibility of some non-commercial value discernable in the communication does not automatically transform the former into the latter.

It has been observed that:

(a)ny advertiser could insert a public interest element into his message . . . Commentators have argued, however, that the line drawing problem is not in practice a serious one, in any case not serious enough to justify abandoning the distinction entirely.

Notes: Constitutional Protection of Commercial Speech, supra, 82 *Col.L.Rev.* 726 n. 42. *See also, Irwin v. Gavit,* 268 U.S. 161, 168, 45 S.Ct. 475, 476, 69 L.Ed. 897 (1925) (Holmes, J.) (where to draw lines "is the question in pretty much everything worth arguing in the law"). After considering the preliminary record before the Court on this motion, we presently regard the speech in plaintiffs' group product demonstrations as only "commercial speech", in accordance with the definition set forth in *Central Hudson.*

### V.

Having provisionally identified plaintiffs' activity as commercial speech, we next must evaluate the regulation in accordance with the standard established in *Central Hudson:*

At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it

is not more extensive than is necessary to serve that interest.

447 U.S. at 567, 100 S.Ct. at 2352.

■ Before commencing this *Central Hudson* analysis, we note that this particular regulation of commercial speech must be evaluated "in light of the special characteristics of the school environment", *Tinker v. Des Moines Independent School District,* 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969). More specifically, the Supreme Court has explained that:

A university's mission is education, and decisions of this Court have never denied its authority to impose reasonable regulations compatible with the mission upon the use of its campus and facilities. We have not held, for example, that a campus must make all of its facilities equally available to students and nonstudents alike, or that a university must grant free access to all of its grounds or buildings.

*Widmar v. Vincent,* 454 U.S. 263, 268 n. 5, 102 S.Ct. 269, 273 n. 5, 70 L.Ed.2d 440 (1981).

At the same time, however, it is clear that the constitutional protection of speech or expression does not stop "at the schoolhouse gate". *Tinker, supra,* 393 U.S. at 506, 89 S.Ct. at 736. Our task, then, is to measure the regulation against the *Central Hudson* standard, with due consideration for the university's educational objectives.

### A.

The initial inquiry involves the lawfulness and truthfulness of the speech being regulated. Defendant has not contended on this motion that a group demonstration of cookware is unlawful, except insofar as it transgresses the university regulation challenged herein. Nor has the defendant chosen, at this stage, to submit evidence tending to show that the information disseminated by AFS is deceptive or misleading. It has been suggested, however, that the speech in question is inherently coercive, because it is delivered in the course of in-person solicitation. The extent to which an AFS demonstration may be deemed "in-person solicitation" and analyzed accordingly is addressed

below. But it may be noted here that, even if accurate, the characterization "does not remove the speech from the protection of the First Amendment ... it lowers the level of appropriate judicial scrutiny." *Ohralik v. Ohio State Bar Ass'n., supra,* 436 U.S. at 457, 98 S.Ct. at 1919. Thus, plaintiffs' speech appears to satisfy the first step of the *Central Hudson* analysis.

### B.

The next step in this analysis is determining whether the interests asserted by the government are substantial. The defendants have submitted an affidavit by Dr. Ronald M. Bristow, Assistant Vice Chancellor for Student Affairs for SUNY, wherein he attests that "[t]he continuation of State University's policy prohibiting such [commercial] activity, particularly as applied to residence halls, is crucial to the fulfillment of the University's educational mission". *Affidavit of Dr. Bristow* ¶ 7. In particular, Dr. Bristow maintains that extending use of the densely populated residence halls to private commercial activities "would introduce a potential disruptive element which would make it far more difficult to maintain the desirable educational atmosphere." *Id.* ¶ 10. He also anticipates that the presence of commercial activities would make it far more difficult for the university to meet its "legal obligation to provide and maintain safe and secure residence hall facilities to its students." *Id.* ¶ 12. Finally, although he acknowledges that the university does not function *in loco parentis,* Bristow nonetheless states that "there is a reasonable expectation that the University will not create or condone situations where students may be captively exposed to unethical exploitation".

▮ Thus, the three interests identified by the university are (1) preventing disruption; (2) protecting the safety and security of the students; and (3) protecting students from commercial exploitation. It is clear to the Court that the first two of these interests are legitimate and substantial. Plaintiffs allege—and it may well be the case—that the university tolerates non-commer-

cial activities in the residence halls that are more disruptive and hazardous than commercial activity would be. We find no support for the view, however, that by tolerating certain forms of disruptive or hazardous activities the university has waived or otherwise forfeited its interest in managing residence hall affairs. Moreover, we can discern nothing insidious about singling out commercial activity—including commercial speech—for special regulatory treatment. The Supreme Court has consistently held that commercial speech is to be accorded "a limited measure of protection, commensurate with its subordinate position on the scale of First Amendment values, while allowing modes of regulation that might be impermissible in the realm of non-commercial expression". *Ohralik, supra,* 436 U.S. at 456, 98 S.Ct. at 1918. The University's greater tolerance of non-commercial speech in its residence halls is thus in harmony with current First Amendment doctrine. *See, AFS v. Penn State, supra,* 618 F.2d at 259 ("... AFS is incorrect in its assertion that Penn State policy violates the First Amendment because it treats non-commercial speech differently from commercial speech").

▮ The third interest identified by the defendants, protection of the students from commercial exploitation, is also legitimate and substantial. Consumer protection is quite obviously an area of considerable governmental interest, as evidenced by the multitude of state and federal legislation on the subject. To be sure, the Supreme Court has emphatically rejected "the 'highly paternalistic' view that consumers are to be protected by 'being kept in ignorance'." *Virginia Pharmacy, supra,* 425 U.S. at 769, 96 S.Ct. at 1829; *see, Central Hudson, supra,* 447 U.S. at 562, 100 S.Ct. at 2349. However, the Court was plainly concerned with the *method* by which the government sought to promote consumer protection; it by no means intimated that the protection of consumers was not a valid area of governmental interest.

▮ It is also clear that SUNY Cortland does not function *in loco parentis, Brad-*

shaw v. Rawlings, 612 F.2d 135, 138–40 (3d Cir.1979); *Bellnier v. Lund,* 438 F.Supp. 47, 53 (N.D.N.Y.1977) (Munson, C.J.). Though not a parent, SUNY is nonetheless a governmental entity administering a campus with a substantial student population. The Court finds no basis for concluding that it may not promote consumer protection within its sphere, provided its regulations in furtherance of that goal are tailored to comply with the *Central Hudson* standard (e.g., the restriction of commercial speech may be no "more extensive than is necessary to serve that interest"), and are otherwise lawful.

### C.

Having concluded that the governmental interests identified by the defendants are substantial, it becomes necessary to consider "whether the regulation directly advances the governmental interest asserted . . ." *Central Hudson,* 447 U.S. at 567, 100 S.Ct. at 2352. In this regard, the Supreme Court has instructed that "the regulation may not be sustained if it provides only ineffective or remote support for the government's purpose". Id. at 564, 100 S.Ct. at 2350.

Based on the record before the Court on this motion, there appears to be only an indirect link between the restriction of commercial speech and the prevention of disruptive, unsafe, and unsecure conditions in the residence halls. Defendant's view, that the restriction is all that stands between the students and a flood of distracting commercialism has simply not been substantiated. Because the rule appears premised upon "an undifferentiated fear or apprehension of disturbance" rather than "a demonstrable harm", it does not withstand the rigorous scrutiny the First Amendment warrants. *Tinker v. DeMoines Independent Com. Sch. Dist., supra* 393 U.S. at 508, 89 S.Ct. at 737; *Katz v. McAulay, supra,* 438 F.2d at 1061.

Although this conclusion is based solely on the record adduced at this motion, we note that Judge Muir arrived at a similar conclusion based on the record before that Court. *AFS v. Penn State, supra* at 33–34 (Dec. 21, 1982) ("as drafted, Penn State's regulations do not address anticipated problems").

By contrast, the prohibition of all commercial activity most certainly does directly advance the university's interest in consumer protection, but as discussed below in the fourth part of the *Central Hudson* analysis, it is more extensive than is necessary to serve that interest.

### D.

▮ Even where a regulation restricting commercial speech directly promotes a substantial governmental interest, "if the governmental interest could be served as well by a more limited restriction on commercial speech, the excessive restrictions cannot survive". *Central Hudson, supra,* 447 U.S. at 564, 100 S.Ct. at 2350. Applying this criterion, the most conspicuous defect of the university regulation appears. One would have to be "unimaginative indeed" to be unable to conceive of less onerous means that would adequately serve the interests identified by the defendants. *Widmar v. Vincent, supra,* 454 U.S. at 279 n. 3, 102 S.Ct. at 272 n. 3 (Stevens, J., concurring), *quoting, Illinois Elections Bd. v. Socialist Workers Party,* 440 U.S. 173, 189, 99 S.Ct. 983, 992, 59 L.Ed.2d 230 (1979) (Blackmun, J., concurring). To begin with, it is likely that the university's interest in preventing disruptive, unsafe, and unsecure conditions in the residence halls could be served by reasonable restrictions on the time, place, and manner of product demonstrations. The registration of invited vendors might further serve such interests. Plaintiffs have indicated their willingness to abide by such rules; defendants have advanced no persuasive reasons why such rules would be ineffective or impractical.

▮ A blanket prohibition on commercial speech is a particularly overbroad and inappropriate means of protecting students from commercial abuses. In *Virginia Pharmacy, supra,* 425 U.S. at 769–770, 96 S.Ct. at 1829, the Supreme Court emphatically rejected the view that government may

protect consumers by shielding them from commercial information. As the Court explained:

> There is, of course, an alternative to this highly paternalistic approach. That alternative is to assume that this information is not in itself harmful, that people will perceive their own best interests if only they are well enough informed, and that the best means to that end is to open the channels of communication rather than to close them.

Id. at 770, 96 S.Ct. at 1829. *See also, Linmark Assoc., Inc. v. Township of Willingboro,* 431 U.S. 85, 97, 97 S.Ct. 1614, 1620, 52 L.Ed.2d 155 (1977). For this reason, the state may not "completely suppress information when narrower restrictions on expression would serve its interests as well." *Central Hudson, supra,* 447 U.S. at 565, 100 S.Ct. at 2351.

There appear to be a number of less restrictive means by which the university may further its interest in protecting students from the commercial abuses which would arguably accompany commercial speech in the residence halls. The registration of vendors who are invited to demonstrate their wares on campus would serve the interest in consumer protection as well as the others interests discussed previously. The university might also exclude from residence halls vendors found to have engaged in misleading speech or other abusive practices.

Defendant has contended that group product demonstrating is itself an abusive practice which may be banned completely. Support for this contention is derived from *Ohralik v. Ohio State Bar Ass'n., supra,* 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978), in which the Court held that a bar association could constitutionally prohibit the in-person solicitation of clients by lawyers. Although *Ohralik* does address special dangers inherent in solicitation by lawyers, it is by no means inapposite. There is a clear recognition in *Ohralik* of the "detrimental aspects of face-to-face selling even of ordinary consumer products." *Id.* at 464, 98 S.Ct. at 1922. Indeed, the Court identi-

fied the particular abuses engendered by in-person solicitation, which justify a broader scope of governmental regulation:

> Unlike a public advertisement, which simply provides information and leaves the recipient free to act upon it or not, in-person solicitation may exert pressure and often demands an immediate response, without providing an opportunity for comparison or reflection. The aim and effect of in-person solicitation may be to provide a one-sided presentation and to encourage speedy and perhaps uninformed decisionmaking...

*Id.* at 467, 98 S.Ct. at 1924. *See also, AFS v. Penn State, supra* 464 F.Supp. at 126.

However, it appears on the record before the Court that the activity engaged in by AFS is not truly "in-person solicitation" in the sense used in *Ohralik.* The abuses identified by the Court primarily arise when, as in *Ohralik,* the seller approaches the prospective customer without invitation. By contrast, AFS representatives are invited to conduct their demonstrations, and interested students voluntarily attend. While it is true that the prospective customers are then subjected to a "one-sided presentation", and it may also be the case that AFS "encourage(s) speedy and perhaps uninformed decisionmaking" (although this has not yet been proven), the government's interest is considerably attenuated where such customers have approached the vendor rather than the reverse.

■ There is an even more basic reason why the dangers of in-person solicitation expressed in *Ohralik* do not support the suppression of commercial speech in this case. As set forth, *infra,* the Court finds it necessary to distinguish between the dissemination of information by AFS, which is protected by the First Amendment, and the consummation of sales in residence halls, which is not so protected. Because it is the Court's determination that SUNY may lawfully prohibit the consummation of sales in residence halls, then the most abusive aspect of in-person solicitation—that it "demands an immediate response without op-

portunity for comparison or reflection"—is removed.

It, therefore, appears to the Court that the plaintiffs are likely to prevail on their claim that the defendants may not constitutionally prohibit AFS from conducting a group demonstration of its products in a dormitory room at SUNY Cortland when invited to do so by the resident-student. The complete ban on such commercial speech does not satisfy the final two requirements of *Central Hudson,* that the regulation directly advance the governmental interests asserted, and that it be no more extensive than necessary to serve such interests.

## VI.

■ As warned above, the determination that plaintiffs are likely to establish a First Amendment right to disseminate and receive commercial information in dormitory rooms is not the end of this analysis. It appears from the record that the group product-demonstration conducted by AFS consists of two portions: a communicative portion wherein the products are described and other information is imparted, and a subsequent transactional portion wherein sales contracts and credit agreements are concluded. The first portion is commercial speech, and is protected by the First Amendment to the extent discussed previously. The second portion, however, is legal conduct—the creation of legal relations by contract. Although the consummation of a commercial transaction has a communicative element, it is not "speech" protected by the First Amendment. As the Supreme Court emphasized in *Ohralik v. Ohio State Bar Ass'n, supra,* 436 U.S. at 457, 98 S.Ct. at 1919:

> Moreover, "*it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or*

printed". *Giboney v. Empire Storage & Ice Co.,* 336 U.S. 490, 502, 69 S.Ct. 684, 691, 93 L.Ed. 834 (1949). Numerous examples could be cited of communications that are regulated without offending the First Amendment, such as the exchange of information about securities . . . corporate proxy statements . . . the exchange of price and production information among competitors . . . and employer's threats of retaliation for the labor activities of employees . . . Each of these examples illustrates that the State does not lose its power to regulate commercial activity deemed harmful to the public whenever speech is a component of that activity. (emphasis added).

Indeed, In *Ohralik,* the Court recognized virtually the same distinction being made here when it noted that, "The [Bar association's] Rule does not prohibit a lawyer from giving unsolicited advice; it proscribes the acceptance of employment resulting from such advice".[4] 436 U.S. at 458, 98 S.Ct. at 1919.

The decisions involving Penn State have consistently recognized that the consummation of sales is subject to greater regulation than the dissemination of information. In the first such decision, *AFS v. Penn State, supra,* 464 F.Supp. at 1256, Judge Muir found that AFS demonstrations were comprised of two parts: "a demonstration of . . . products" and "a sales portion"; and he upheld the regulation based, in part, on his conclusion that "[e]ssentially, Penn State has attempted to separate business transactions from the speech which accompanies them and has sought to regulate only the former." *Id.* at 1262.

On appellate review, the Third Circuit rejected AFS's contention that it had a First Amendment right, under *Virginia Pharmacy,* to sell its products. As the Court explained,

> The [*Virginia Pharmacy*] Court did not hold that because an individual may have a right to receive certain advertising in-

---

**4.** *Ohralik* is nevertheless accurately characterized as a "commercial speech" case, because the rule prohibited solicitation, which is

"speech", as well as the consummation of an employment agreement which is "conduct". 436 U.S. at 453 n. 9, 98 S.Ct. at 1917 n. 9.

formation that individual also has a right to participate in a commercial transaction whenever he or she pleases.[5]

The subsequent Penn State decisions did not abandon this distinction. A complicating factor arose, however, in that Penn State attempted to censor the speech engaged in by AFS, by eliminating from the presentation language that constituted "the solicitation of sales rather than educational or informational information". *AFS v. Penn State,* 522 F.Supp. at 549; *see also, AFS v. Penn State, supra,* 510 F.Supp. at 986. When the case returned to the Third-Circuit, the Court explained that, while it had previously upheld Penn States' regulation of the *consummation* of transactions, it was now being called upon to decide "whether Penn State may censor the content of AFS's commercial speech". *AFS v. Penn State, supra,* 688 F.2d at 912. It then proceeded to apply the *Central Hudson* analysis and although it did not find the governmental interests insignificant, it nevertheless concluded that, "(r)estrictions on the *contents* of the demonstration as distinguished from the conduct of the demonstration cannot further these interests." *Id.* at 907 (emphasis in original).

The Court then went on to consider a contention by the recently-added student plaintiffs, that even if AFS did not have a right to sell products at the conclusion of a demonstration, students had a First Amendment right to make such purchases. The Court rejected that claim easily, in view of its prior distinction between speech and conduct:

> Fairly read, the court in *American Future Systems* I sustained the validity of the distinction between the demonstration and the consummation of the transaction, and it did so after considering not only AFS's right to deliver the speech but the "students' rights to take part in the sale there".

*AFS v. Penn State,* 688 F.2d at 914.

Thus, the Third Circuit decisions support the proposition that only the informational portion of the AFS group product demonstration is protected by the First Amendment. However, it should be emphasized that we are not making a distinction, as Judge Muir tentatively did, between the "solicitation" and "informational" aspects of AFS's speech. In our view, all of the communicative aspects of AFS's demonstration are protected under *Central Hudson.* The distinction being made here, however is between the dissemination of information by AFS, which is "speech", and the consummation of sales, which is not.

As might be expected, AFS regards the sales portion of its presentation as "absolutely crucial". *AFS v. Penn State, supra,* 618 F.2d at 254–55. Be that as it may, plaintiffs may not utilize the First Amendment protection accorded to the dissemination of information—which only recently has been extended to commercial information—to pave the way for commercial conduct which is not speech. If there is a right to conclude the transactions, it is found in a source other than the freedom of speech clause in the First Amendment.

### VII.

It is contended by student-plaintiff Fox that the challenged regulation violates his rights of association and privacy, as well as his plaintiff Rapp's Fourth Amendment right to be free from unwarranted searches and seizures. Finally, all the plaintiffs maintain that the defendants have deprived them of due process by enforcing the regulation in an arbitrary ad capricious manner. Since the court has already determined that plaintiffs have shown a likelihood of establishing a First Amendment right to disseminate information about their products, it is only necessary to consider whether the right to consummate sales transactions may be predicated on the constitutional clauses cited above. As the discussion below indicates, the Court finds that plaintiffs are unlikely to prevail on these contentions.

---

**5.** We recognize that Penn State, unlike SUNY, allowed an individual student to invite a sales representative to his or her room to individual-ly complete the sale. This, however, has no bearing on our conclusion that the transaction itself is *conduct,* not *speech.*

### A.

Plaintiff Fox indeed enjoys a First Amendment right to associate with other persons of his choice, and where that association is purposeful, it is protected "whether the beliefs sought to be advanced pertain to political, economic, religious, or cultural matters". *NAACP v. Alabama,* 357 U.S. 449, 460, 78 S.Ct. 1163, 1170, 2 L.Ed.2d 1488 (1959); *See, Smith v. Arkansas State Highway Employees,* 441 U.S. 463, 464, 99 S.Ct. 1826, 1827, 60 L.Ed.2d 360 (1979); *Coates v. City of Cincinnati,* 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971).

Nevertheless, it is difficult to conceive of how the challenged regulation deprives Fox of his associational rights. *See, AFS v. Penn State, supra.* 510 F.Supp. at 987. The regulation does not restrain him from inviting any individual to his dormitory room. Indeed, if the prohibition is limited to commercial transactions, as opposed to commercial speech, then Fox may even invite persons to his room for the purpose of participating in a group product demonstration. The important point, however, is that SUNY is not restraining association, it is restraining conduct. The fact that AFS may no longer desire to associate with Fox in his dormitory room if it is unable to sell cookware to him at that time does not, in our view, implicate First Amendment associational rights.

In its most recent decision, the Third Circuit did express concern that Judge Muir had not adequately considered "the students' associational and free speech rights in the activities in their dormitory rooms independently from the activities conducted in the common areas". *AFS v. Penn State, supra,* 688 F.2d at 915. It then specified the reason for its concern:

> The difficulty is that on this record we do not know whether there is a blanket prohibition against all organized group activity, and there have been no findings made by the district court as to the basis for such a prohibition.

*Id.* at 915. Clearly, a blanket prohibition on all group activity would implicate associational rights. However, nothing in the Third-Circuit's decision affords any basis for recognition of an associational right to consummate transactions.

### B.

Plaintiff Fox is also highly unlikely to prevail on his claim that the regulation impairs his right to privacy. That argument has been consistently and persuasively rejected in Pennsylvania. *AFS v. Penn State, supra,* 688 F.2d at 915–916; *AFS v. Penn State, supra,* 522 F.Supp. at 553–54; *AFS v. Penn State, supra,* 510 F.Supp. at 987. In the most recent Third Circuit decision, the Court explained that the Supreme Court currently recognizes two types of privacy interests:

> "One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions". The latter decisions have encompassed "matters relating to marriage, procreation, contraception, family relationships, and child rearing and education". *Paul v. Davis,* 424 U.S. 693, 713, 96 S.Ct. 1155, 1166, 47 L.Ed.2d 405 (1976)

The Court then concluded that:

> ... the intimate personal nature of the rights previously accorded privacy protection is a far cry from the right asserted here, the right to host and attend a demonstration of cookware. We are unwilling to extend the constitutional right of privacy to commercial transactions completely unrelated to fundamental personal rights and therefore affirm the district court's rejection of that basis of plaintiffs' claims.

*Id.* at 915–16. This Court adheres to the view expressed by the Third Circuit, and finds the privacy claim unlikely to be meritorious.

### C.

Plaintiffs refer the Court to the events leading up to the arrest of Ms. Rapp on October 19, 1982, and contend that the conduct of the defendants violated the search and seizure clause of the Fourth Amendment. The claim is asserted by plaintiff

Rapp and by plaintiff Fox, who maintains that he is "subject to the continuing threat of such unlawful search and seizure at the hands of the SUNY administration". *Plaintiffs' Brief* at 43.

It is unnecessary to address either the probable merit of the Fourth Amendment claim, or the troublesome collateral issues of standing, ripeness, and abstention. It need only be observed that the claim, even if meritorious, does not address the validity of the prohibition on commercial activity, and therefore does not furnish a ground for the injunctive relief sought in this motion.

### D.

Finally, plaintiffs argue that the defendants are depriving them of liberty without due process by enforcing the regulation in an arbitrary and capricious manner. In particular, plaintiffs maintain that by allowing certain concerns to operate on campus, but not others, the defendants have acted with neither logic nor reason.

The Court fully appreciates that the "touchstone of due process is protection of the individual against arbitrary action of government". *Wolff v. McDonnell,* 418 U.S. 539, 558, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974). Nonetheless, it is doubtful that plaintiffs will be able to establish such arbitrary action in this instance. The commercial enterprises which SUNY has excepted from its prohibition (i.e., those that "provide for food, legal beverages, campus bookstore, vending, linen supply, laundry, dry cleaning, banking, barber and beautician services and cultural events") might reasonably be characterized "commercial activities which serve the essential and educationally-related needs of all students and which are beyond the capacity of the University to provide ..." *Affidavit of Dr. Bristow* ¶ 6. The sale of cookware might reasonably be excluded from this category. Though one might argue over the inclusion or exclusion

of any particular product or service, it by no means appears that the current formulation is "arbitrary or capricious".[6]

### VIII.

As set forth above, plaintiffs have failed to demonstrate a likelihood of success on the merits with respect to their claim of a Constitutional right to consummate transactions in dormitory rooms. Turning now to the alternative basis for a preliminary injunction, we hold that plaintiffs have also failed to establish "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting preliminary relief". *Jackson Dairy, Inc. v. H.P. Hood & Sons, supra,* 596 F.2d at 72. Plaintiffs' showing with respect to the latter portion of this requirement is particularly inadequate. It should suffice to observe that denial of injunctive relief merely maintains the *status quo* for the course of this litigation, and that none of the plaintiffs are being deprived of any opportunity that they have enjoyed previously, or have been led to expect would be forthcoming.

### IX.

The Court holds that (1) plaintiffs have shown a likelihood of success on the merits insofar as they claim a right to disseminate and receive commercial information through group product demonstrations conducted in the dormitory rooms of inviting students at SUNY-Cortland; (2) Plaintiffs have failed to show a likelihood of success on the merits insofar as they claim a right to consummate sales of products in the dormitory rooms of inviting students at SUNY Cortland, nor have they demonstrated other grounds for a preliminary injunction with respect to this claim.

The relief warranted by the Court's holding is as follows:[7]

---

**6.** We also note that there is considerable doubt that plaintiffs can identify a specific "liberty interest" they have which the university if depriving them of without due process. *See, AFS v. Penn State, supra,* 522 F.Supp. at 555.

**7.** In *AFS v. Penn State, supra,* 553 F.Supp. 1268 (1982) Judge Muir granted a preliminary injunction, but limited it to permitting the one named student-plaintiff to host the demonstration. In Judge Muir's view, because the action

1. Pursuant to Rule 65, Fed.R.Civ.P., defendants are hereby enjoined, until further notice from this Court, from enforcing SUNY Resolution No. 66–156 as amended by 73–56 to the extent of barring plaintiffs from disseminating and receiving information in the course of group product demonstrations conducted in the dormitory room of an inviting student at SUNY-Cortland. Nothing in this Order shall restrain defendants from promulgating and enforcing reasonable restrictions governing the time, place, and manner of such demonstrations.

2. All other preliminary relief sought by plaintiffs is hereby denied.

IT IS SO ORDERED.

was not brought on behalf of a class it was not necessary to award provisional relief to any but the prevailing named plaintiff. This court, however, has recognized a likelihood that all the plaintiffs, including AFS, enjoy certain commercial speech rights; and the injunctive relief is framed accordingly.